2017 UT App 59

# THE UTAH COURT OF APPEALS

JP's LANDSCAPING AND AUTO OWNERS INSURANCE,
Petitioners,
*v.*
LABOR COMMISSION AND ALBERTO MONDRAGON,
Respondents.

Opinion
No. 20150898-CA
Filed March 30, 2017

Original Proceeding in this Court

Mark R. Sumsion and Cody G. Kesler, Attorneys
for Petitioners

Jaceson R. Maughan and William Barlow, Attorneys
for Respondent Labor Commission

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and DAVID N. MORTENSEN concurred.

ROTH, Judge:

¶1 JP's Landscaping (JPL) requests review of the Labor Commission's award for workers' compensation benefits arising out of an industrial accident that occurred in May 2012 involving one of JPL's employees. We decline to disturb the Commission's decision.

## BACKGROUND

¶2 On May 22, 2012, the first day of his employment, JPL employee Alberto Mondragon suffered an injury. The accident occurred as Mondragon, "almost running," pushed a wheelbarrow full of gravel over uneven ground. Mondragon slipped, and as he did, the wheelbarrow "tipped over."

Mondragon claimed that, as the wheelbarrow tipped, its "handles [took] hold of him in different directions," which caused "pressure on his [right] knee." At that point, Mondragon claims "he felt a sudden pop in the knee." Although he did not "fall to the ground" and was instead "able to catch himself," Mondragon reported that the inside area of his right knee—both front and back—began to immediately swell.

¶3     Mondragon reported the incident to his supervisor when she arrived at the site, and, within three hours of the incident, he reported to a WorkMed clinic. The physician who examined him, Dr. Britt, noted Mondragon's explanation that the injury involved a wheelbarrow full of gravel that tilted and caused pressure on Mondragon's right knee and that there was a "sudden pop" in that knee. Dr. Britt then noted that there was "no visible bruising" but that there "may be slight swelling above the joint line medially" and that Mondragon had "diffuse tenderness . . . around the medial joint line area." He also noted that, although Mondragon was able to extend and flex the knee, "[a]ny attempts at rotation and extension cause[d] [Mondragon] to have marked pain." Dr. Britt diagnosed Mondragon with a right knee sprain and stated that the sprain was the "result of the industrial injury/exposure described." He prescribed a knee support and pain medication. He also referred Mondragon to an orthopedic specialist for further evaluation and released him to light-duty work. Because JPL did not have light-duty work available, it terminated Mondragon's employment. Mondragon was out of work until July 15, 2012, when he began working for another employer.

¶4     In August 2012, Mondragon requested a hearing before an administrative law judge (the ALJ) to determine his entitlement to workers' compensation benefits related to the accident. Mondragon represented himself at the hearing. When asked to explain how the accident occurred, he explained that he was "almost running" while pushing a wheelbarrow full of

gravel and that the wheelbarrow tipped to the side, catching his knee between the two handles. He testified that he "felt [his] knee popping and twisting to the side" or that "maybe only nerves got twisted," and that there was immediate swelling around his right knee. He also testified that Dr. Britt later informed him that he had suffered a "severe sprain." On cross-examination, however, JPL demonstrated that the mechanism of injury Mondragon had described—that his right knee became caught between the two handles of the wheelbarrow—was physically impossible. Specifically, counsel for JPL asked Mondragon to demonstrate how his accident had occurred using a comparable wheelbarrow that JPL produced at the hearing. It became obvious that Mondragon's knee could not have been caught between the two handles, because as the wheelbarrow tipped, the left handle would have been significantly higher than his right knee and could not have caught his right knee or struck it. Mondragon stated, however, that even if he did not know "how [the wheelbarrow] caught [his knee]," his right knee still "got caught . . . and the wheelbarrow tipped over to the side" and that the right handle "was the one that hit [him]," which was when he felt his "[right] knee kind of popping towards the outside."

¶5    In her interim findings of fact and conclusions of law issued after the hearing, the ALJ concluded that although "[t]he exact mechanism of injury is unclear" and Mondragon mistakenly "believed that one of the handles of the wheel barrow hit his right knee," Mondragon had nevertheless suffered an injury that "arose out of an industrial accident." The ALJ also concluded that there were conflicting opinions regarding the medical cause of Mondragon's continuing knee problems, with Mondragon's treating physicians stating that the accident caused Mondragon's injury and the need for further treatment, while an independent medical examiner that JPL hired had concluded that, at most, the accident aggravated preexisting knee conditions. The ALJ therefore referred the case

to a medical panel to consider the question of medical causation. In the charging letter, the ALJ asked the panel to answer whether there was "a medically demonstrable causal connection between [Mondragon's] medical problem and the industrial accident as described in [the] Interim Order"; to "identify the medical care necessary to treat [Mondragon's] problems caused by the industrial accident"; and to "identify any and all future medical care . . . that will be necessary in treating [Mondragon's] problems caused by the industrial accident."

¶6    The ALJ found in her interim order that Mondragon could not have been injured by "one of the handles of the wheel barrow hit[ting] his right knee" and advised the medical panel in her charging letter that the panel was "bound by" the findings and conclusions in the interim order. In its report, the medical panel characterized Mondragon's injury as a "twisting type injury" and described the accident as occurring when the wheelbarrow's "handle caught [Mondragon's] right leg" as it tipped over and Mondragon "twisted to free himself from the flipped wheel barrow." On this basis, the medical panel concluded that there was a "causal connection between the injury suffered in 2012 and the ongoing knee problem." The panel had examined Mondragon and reviewed his medical history and determined that the type of pain he experienced— "mostly medial side pain" along with "recurrent swelling" in the joint—was consistent with meniscal knee injuries. It also noted that, although Mondragon had suffered a number of knee injuries in the past, "all previous injuries to the right knee were diagnosed contusions" that "improved in less than four months" with "no residual symptoms." Further, although arthritis could have been a cause of similar symptoms, the panel noted that radiographic images of the knee "show[ed] healthy joint weight bearing surfaces, with minimal arthritic changes consistent with age and heavy use" and opined that "the excellent joint space seen on [Mondragon's] radiographs" would weigh against a conclusion that arthritis was the cause. The medical panel

concluded that "the twisting type injury with medial pain, the prolonged nature of the medial joint line pain and swelling, the findings on physical examination of medial pain, . . . all suggest an injury to the meniscus" from the accident, which "seldom heal[s] with time." As a consequence, the panel opined that Mondragon required further medical care to treat his knee injury, including an operation to repair the meniscal tear, follow-up physical therapy and medication, and other associated medical care.

¶7    JPL objected to the medical panel report, arguing that the case should have been dismissed before referral to the panel because Mondragon "did not meet his burden of proving that an accident occurred." JPL also argued that the panel's report should not be admitted in any event, because the medical panel "relied upon a mechanism of injury which did not occur" when it described the accident as involving the wheelbarrow's "handle" catching Mondragon's right leg as the wheelbarrow tipped over. The ALJ responded to JPL's contentions in her findings of fact and conclusions of law, reiterating and further explaining her conclusion that Mondragon had suffered an industrial accident on the day in question. In particular, the ALJ stated that she found Mondragon's "testimony regarding his work day to be believable and truthful." Although Mondragon's "description [of the accident] is flawed in the details," she said, what "remained quite clear was that [Mondragon] did use his legs and body to try and keep control of the wheel barrow" and that "when the heavy load tipped" Mondragon was "jerked and tousled." She further explained that even though Mondragon might have had a "flawed recollection of the details . . . the case can be made that an accident took place from the facts known before and after the moment of injury," which included "the nature of the heavy work being done, the pace of the work, the loss of control over the wheel barrow[,] and the resultant pain and injury." The ALJ concluded that that evidence "proved that an industrial accident of substantial exertion took place." In

addition, the ALJ rejected JPL's contention that the medical panel had relied on facts inconsistent with the "in court demonstration done with the wheel barrow," in other words, that the panel had relied on Mondragon's discredited original description of the mechanism of injury. She therefore declined to hold a hearing on JPL's objection to the medical panel report and admitted it. The ALJ then ordered JPL to pay Mondragon's "past and future medical bills related to the necessary care of . . . Mondragon's right knee injury consistent with the medical panel's opinion."

¶8    JPL sought review of the ALJ's decision with the Commission. The Commission concluded, as had the ALJ, that Mondragon had suffered a right knee injury as a result of the work-site accident with the wheelbarrow. The Commission explained that, while the "exact mechanism of injury is somewhat unclear, . . . that uncertainty is not fatal" to Mondragon's claim, particularly where it *was* clear that Mondragon's "knee was subject to stress while the fully loaded wheelbarrow tipped over." Nonetheless, the Commission agreed with JPL that the medical panel's opinion was, at least in part, based "on a mechanism involving the wheelbarrow handles that is inaccurate." The Commission concluded that the panel needed to "reassess [Mondragon's] right knee injury in light of the Commission's and [the ALJ's] findings regarding the accident rather than [Mondragon's] inaccurate description" and then readdress whether the accident was a medical cause of the injury.

¶9    In her second charging letter, the ALJ advised the panel that the matter was being remanded "for further review by the medical panel" because the Commission had determined that the report "may have been based on facts which were not consistent with the [interim order] issued after the hearing." Specifically, the ALJ explained that the panel had described the accident as occurring when the tipping wheelbarrow's handle

"caught [Mondragon's] right leg, and [Mondragon] twisted to free himself," but that "[t]here is no evidence that Mr. Mondragon was caught in the wheelbarrow or that he twisted to free himself." Again advising the panel that it was bound by the findings of fact and conclusions of law in her order, the ALJ requested that the panel answer four questions, including the following question most pertinent to the issues in this review:

> Assuming that the exact mechanism of injury is not clear but that Mr. Mondragon's right knee was subject to stress while a fully loaded wheelbarrow tipped over[,] please determine if Mr. Mondragon's right knee problems were medically caused by the work accident or whether his current right knee problems are a continuation of his pre-existing condition and the transient pain he has experienced in the past?

¶10 The medical panel reconsidered the matter accordingly, and, in better alignment with the ALJ's interim findings, disclaimed its previous description of the accident, i.e., that Mondragon's knee had "been caught in the wheelbarrow or that he twisted to free himself." Instead, the panel now acknowledged that the "exact mechanism of injury was unclear" and that it had not been aware in the first evaluation that there was a controversy surrounding the "exact mechanism of injury." The panel further noted that "the interpretation of a twisting type injury" was the panel's conclusion, not Mondragon's. The medical panel again determined, however, that the industrial accident medically caused Mondragon's knee injury, that his condition had not yet stabilized, and that he would need additional treatment. With regard to the relationship between the known facts of the accident and injury, the panel explained that, due to the anatomical configuration of the meniscus, persons who suffer a meniscus tear often report "a sudden pop within the joint" and "often feel[] that [they have] been struck by

something," consistent with Mondragon's description. The person generally suffers "immediate pain on the side of the meniscus and swelling within the joint," and it is "often difficult to extend the knee or place pressure on it," just as Mondragon had reported right after the event. The panel further concluded that while Mondragon had suffered previous knee injuries, those injuries did not involve the same symptoms he exhibited after the May 2012 accident. The medical panel therefore rejected the suggestion that Mondragon's injury was caused by a preexisting knee condition. And the panel concluded, as it had before, that Mondragon's injury was consistent with a meniscal tear. After reviewing the medical panel's second report, the ALJ reaffirmed her previous order awarding benefits to Mondragon stemming from the May 2012 accident.

¶11    JPL sought review by the Commission's Appeals Board. The Board affirmed the ALJ's decision and denied JPL's request for reconsideration. JPL asks that we set aside the Board's decision and the award of benefits in Mondragon's favor.

ISSUES AND STANDARDS OF REVIEW

¶12    JPL argues that the Commission erred in awarding benefits to Mondragon. The Commission's decision to award benefits is a mixed question of fact and law. *Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 9, 339 P.3d 624. "The standard of review we apply when reviewing a mixed question can be either deferential or non-deferential" depending upon whether the question is more fact-like or law-like. *Jex v. Labor Comm'n*, 2013 UT 40, ¶ 15, 306 P.3d 799 (citation and internal quotation marks omitted). Here, "[d]ue to the fact-intensive inquiry involved at the agency level" in determining whether it is appropriate to award benefits, including credibility determinations that an appellate court is "in an inferior position to review," "this case does not lend itself to consistent resolution by a uniform body of appellate precedent." *See Carbon County v.*

*Workforce Appeals Board*, 2013 UT 41, ¶ 7, 308 P.3d 477 (citation and internal quotation marks omitted). This decision is therefore more fact-like, and deference to the Commission's decision is warranted. *See id.*

¶13　The Commission is the ultimate fact finder in workers' compensation claims. *See e.g.*, *Danny's Drywall*, 2014 UT App 277, ¶ 14 ("[T]he ALJ/Commission is always the ultimate fact finder." (alteration in original) (citation and internal quotation marks omitted)). We will uphold the Commission's "factual findings if such findings are supported by substantial evidence based upon the record as a whole." *Ernest Health, Inc. v. Labor Comm'n*, 2016 UT App 48, ¶ 10, 369 P.3d 462 (citation and internal quotation marks omitted). Substantial evidence exists when the findings are supported by "more than a mere scintilla of evidence," and "[a]n administrative law decision meets the substantial evidence test when a reasonable mind might accept as adequate the evidence supporting the decision." *Martinez v. Media-Paymaster Plus*, 2007 UT 42, ¶ 35, 164 P.3d 384 (citations and internal quotation marks omitted).

¶14　"In order to determine whether a decision is supported by substantial evidence, the reviewing court must consider the whole record before the lower court," which includes "evidence in support of the administrative finding, as well as evidence that detracts from the finding." *Id.* ¶ 36. However, "[i]t is not this court's place to substitute its judgment as between two reasonably conflicting views." *EAGALA, Inc. v. Department of Workforce Servs.*, 2007 UT App 43, ¶ 16, 157 P.3d 334 (citation and internal quotation marks omitted). Rather, it is the "province of the [Commission], not appellate courts, to resolve conflicting evidence, and where inconsistent inferences can be drawn from the same evidence, it is for the [Commission] to draw the inferences." *Id.* (citation and internal quotation marks omitted).

¶15 JPL also contends that the Commission improperly denied its request to conduct discovery into the claims history of Mondragon's wife and adult son. "[T]he Commission is afforded broad discretion in determining how best to conduct its inquiry into each case," and we will not disturb the Commission's discovery decision unless it "exceed[s] the bounds of the Commission's discretion." *See Ernest Health*, 2016 UT App 48, ¶¶ 6–7; *see also* Utah Code Ann. § 63G-4-403(4)(h)(i) (LexisNexis 2014) (explaining that an appellate court "shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by . . . an abuse of the discretion delegated to the agency by statute"); *id.* § 34A-2-802(1) (2015) (explaining that an ALJ and the Commission "may make its investigation in such manner as in its judgment is best calculated to ascertain the substantial rights of the parties and to carry out justly the spirit" of the Workers' Compensation Act).

## ANALYSIS

¶16 JPL on appeal essentially contends that, once it disproved the precise mechanism of injury that Mondragon described, Mondragon's credibility was destroyed, but that the Commission then created an alternative theory of the accident on its own that has no basis in the evidence to support its award of benefits. As a consequence, JPL claims that it was deprived of fair notice and an opportunity to defend against Mondragon's claims. JPL also contends that it was foreclosed from pursuing its theory that Mondragon's claim was fraudulent when the ALJ, and later the Commission, denied its requests to conduct discovery on the claims history of Mondragon's wife and adult son.

### I. The Award of Benefits

¶17 To recover workers' compensation, an employee must demonstrate that he or she has been "injured . . . by accident

arising out of and in the course of the employee's employment." Utah Code Ann. § 34A-2-401(1) (LexisNexis 2015). "This section sets forth two prerequisites to recovery." *Smith's Food & Drug, Inc. v. Labor Comm'n*, 2011 UT App 67, ¶ 7, 250 P.3d 1008 (citing *Allen v. Industrial Comm'n*, 729 P.2d 15, 18 (Utah 1986)). First, the employee must show that the claimed injury occurred by accident. *Id.* Second, the employee must show that there is "'a causal connection between the injury and the employment.'" *Id.* (quoting *Allen*, 729 P.2d at 18). In other words, the "by accident" element is distinct from the "causal connection" element. *See id.*

¶18 JPL argues that the award of benefits was based upon factual findings that do not have support in the evidence submitted by Mondragon—both as to the injury itself and causation. Instead, according to JPL, the Commission improperly determined that Mondragon had been injured in an industrial accident by inferring that he was merely mistaken about the mechanism of injury, which it claims has no basis in the evidence. And JPL contends that the Commission then improperly advocated for Mondragon by creating an alternative theory of injury—the significant stress theory—that also had no support in the evidence, and then relied on the subsequent reports from the medical panel to justify awarding benefits on that basis. In JPL's view, the physical mechanism described by Mondragon constituted the theory of injury under which he submitted his claim. Once JPL disproved the theory of mechanism at the hearing, the case should have been dismissed because Mondragon had failed to establish that an industrial accident had even occurred. JPL also contends that because it disproved Mondragon's description of the mechanism of injury, the doctors' reports submitted by Mondragon were necessarily rendered "foundationless," because the doctors had relied upon that mechanism in making their professional assessments. As a result, the doctors' reports could not have provided evidence that there was a dispute about medical causation sufficient to

refer the case to the medical panel. Thus, according to JPL, Mondragon did not establish medical causation.

¶19 In this section, we first address whether the evidence supported the Commission's determination that Mondragon suffered an industrial accident. Next, we address whether the Commission improperly created a theory of injury to support its award of benefits, thereby advocating on behalf of Mondragon. Finally, we address whether the medical panel referrals were proper.

A. The Industrial Accident

¶20 JPL attacks the sufficiency of the evidence supporting the Commission's determination that Mondragon suffered injury from an industrial accident. JPL argues that by disproving Mondragon's description of the precise mechanism of injury, it also disproved Mondragon's claim that an accident occurred at all. Therefore, JPL reasons, the Commission had no basis to conclude that Mondragon was confused about the mechanism of injury. Rather, according to JPL, the Commission sua sponte created an alternate theory of injury—what JPL characterizes as "the significant stress theory"—which had no basis in the evidence. In essence, JPL contends that the evidence demonstrated Mondragon was lying about the entire incident and that the Commission had no basis for believing his story about a workplace accident.

¶21 The Commission recognized that, because of the demonstration with the wheelbarrow at the hearing, the industrial accident could not have occurred in exactly the way Mondragon described. Nonetheless, the Commission found that Mondragon was "believable and truthful" regarding the occurrence of an accident and that although his description of the mechanism of injury was "flawed in the details," at the time the "full wheelbarrow tilted" and fell over, Mondragon experienced "significant stress on his right knee," which resulted

in "a sudden 'pop' and pain in his right knee." The Commission noted that, even if "the specific action that result[ed] in [Mondragon's] internal injury" was "unclear," Mondragon had "consistently described that he experienced a sudden onset of pain" as the wheelbarrow tipped, a description corroborated by Dr. Britt's assessment three hours after the accident. Thus, on the basis of both Mondragon's testimony and Dr. Britt's report, the Commission concluded that Mondragon "did suffer a right-knee injury" as a result of the industrial accident.

¶22　We will uphold the ALJ's and the Commission's factual findings that Mondragon suffered an injury through an industrial accident if we determine that there is substantial evidence to do so. *See Ernest Health, Inc. v. Labor Comm'n*, 2016 UT App 48, ¶ 10, 369 P.3d 462. And with regard to the credibility determination here, "[i]t is not our role to judge the relative credibility of witnesses." *Davis v. Department of Workforce Servs.*, 2012 UT App 158, ¶ 6, 280 P.3d 442 (citation and internal quotation marks omitted). Rather, "when the evidence is disputed, as it was here, we defer to the Board's assessment of credibility and resolution of conflicting evidence." *Id.* (brackets, citation, and internal quotation marks omitted); *see also Carbon County v. Workforce Appeals Board*, 2013 UT 41, ¶ 6, 308 P.3d 477 (explaining that we give deference to the fact finder "because it stands in a superior position from which to evaluate and weigh the evidence and assess the credibility and accuracy of witnesses' recollections" (citation and internal quotation marks omitted)).

¶23　As the Commission noted, Mondragon testified at the hearing that he was injured when he slipped while "almost running" with a wheelbarrow full of gravel which tipped to the side. He stated that as the wheelbarrow fell, his "knee was caught between the two handles," and that he "felt [his] knee popping and twisting to the side," or "maybe only nerves got twisted." He testified that, immediately after he felt the popping,

the inside of his right knee began to swell. Dr. Britt's report corroborated the core aspects of this account. He indicated that Mondragon told him that "he was at work pushing a wheelbarrow full of gravel" when he "slipped," and that "as the wheelbarrow tilted the handles [took] hold of him in different directions," which "caused pressure" on his right knee, whereupon Mondragon "felt a sudden pop in the knee." Importantly, he also noted that "[t]here was no impact on the knee," as Mondragon "did not fall to the ground but was [instead] able to catch himself when this occurred." Dr. Britt's examination notes state that he observed a "diffuse tenderness . . . around the medial joint line area," that there was possibly "slight swelling," and that Mondragon was not able to adequately perform a McMurray test[1] because he experienced "significant pain" with "[a]ny attempts at rotation and extension" of the knee. Dr. Britt diagnosed a right knee sprain and opined that the industrial accident that Mondragon described caused the injury.

¶24 This is "a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support [the] conclusion" that Mondragon experienced an industrial injury. *See Provo City v. Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242 (citation and internal quotation marks omitted). In particular, Mondragon's testimony and Dr. Britt's report constituted evidence that "a reasonable mind might accept as adequate" to suggest that Mondragon was in fact injured during the work-related accident he described. *See Martinez v. Media-Paymaster Plus*, 2007 UT 42, ¶ 35, 164 P.3d 384 (citation and internal quotation marks omitted).

---

1. A McMurray test is "used to evaluate individuals for tears in the meniscus of the knee." *McMurray Test*, Wikipedia.org, https://en.wikipedia.org/wiki/McMurray_test [https://perma.cc/58TT-52PT].

¶25    Moreover, this evidence supports the Commission's characterization of the incident as involving "significant stress" on Mondragon's knee. JPL appears to argue that Mondragon was required to have described a precise mechanism of injury to explain the occurrence of "significant stress" to his knee different from the disproved rotating handles mechanism in order for the Commission to have determined that such stress had actually occurred, and that, because he did not, the Commission's conclusion amounted to an impermissible alternate theory of injury. We do not agree. "In conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable. Instead, we defer to [the Commission's] finding because when reasonably conflicting views arise, it is the [fact-finder's] province to draw the inferences and resolve these conflicts." *Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 11, 339 P.3d 624 (second alteration in original) (citation and internal quotation marks omitted). Here, because the evidence at the hearing presented a conflict regarding the precise mechanism of injury, it was within the Commission's prerogative to weigh the evidence as a whole and to draw the inferences it found to be the most reasonable.

¶26    While JPL is correct that Mondragon did not use the exact words "significant stress" in his description of the event, the fact that he felt his right knee pop and experienced immediate pain as the wheelbarrow tipped over permits a reasonable inference that the knee was subject to significant stress in those moments. Further, Dr. Britt's report supports the Commission's "significant stress" determination. In his notes, Dr. Britt related that Mondragon had told him that his right knee was subjected to "pressure" as he attempted to "catch himself" when "he slipped and the wheelbarrow tilted," which resulted in the "sudden pop" Mondragon reported feeling in his right knee. Dr.

Britt also confirmed that there was indeed an injury.[2] Thus, Mondragon's testimony and Dr. Britt's report support an inference that Mondragon's right knee was subject to stress as the wheelbarrow tipped, even if Mondragon was mistaken about the physical dynamics that led to the injury. As a consequence, the Commission did not, as JPL contends, sua sponte create an alternate theory of injury. The "significant stress" theory of injury was already present in the evidence submitted, and the Commission's characterization of the accident is more properly viewed as arising from reasonable inferences drawn from the potentially conflicting evidence surrounding how Mondragon's internal knee injury occurred as the wheelbarrow began to tip over. *See EAGALA, Inc. v. Department of Workforce Servs.*, 2007 UT App 43, ¶ 16, 157 P.3d 334 (explaining that it is the "province of the [Commission], not appellate courts, to resolve conflicting evidence, and where inconsistent inferences can be drawn from the same evidence, it is for the [Commission] to draw the inferences" (citation and internal quotation marks omitted)).

¶27 Nonetheless, JPL essentially contends that the precise mechanism of injury was the lynchpin to Mondragon's entire story and that, because JPL disproved that mechanism, the Commission could not have found the surrounding details of Mondragon's testimony to be credible. But JPL has provided no

---

2. We note, too, that other than asserting that Mondragon fabricated the entire incident, JPL has not pointed us toward any medical report that denies that Mondragon was injured in some way on the day in question. Indeed, even JPL's independent medical evaluator, Dr. Fotheringham, conceded that the accident "could possibly have aggravated" what he characterized as "preexisting degenerative changes" and that the treatment that Mondragon received through Dr. Britt at the WorkMed clinic "was appropriate" to resolve the injury he believed Mondragon incurred.

authority for the proposition it asserts—that once the precise mechanism of internal injury is shown to be impossible, the claimant's recounting of events is necessarily unworthy of belief as a matter of law. Instead, JPL supports its argument by arguing its own assessment of the evidence and claiming that, in its view, the evidence was at least as likely that Mondragon fabricated the entire incident. It also suggests that Dr. Britt's report could fairly be read as evidence that Mondragon's injury was actually preexisting. But JPL cannot persuade us that the Commission erred in its assessment of the evidence or its credibility determination by rearguing on appeal "the facts that [it claims] support its version of the events," *see Carbon County v. Department of Workforce Servs.*, 2012 UT App 4, ¶ 5, 269 P.3d 969, or by attempting to persuade us to reweigh the evidence, *see Provo City*, 2015 UT 32, ¶ 8 ("In conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable." (citation and internal quotation marks omitted)).

¶28   More importantly, while JPL demonstrated that the precise mechanism Mondragon described was physically impossible, JPL has not shown on appeal that the accident as a whole was physically impossible or that the surrounding circumstances could not have led to the injury Mondragon described. *See Ernest Health, Inc. v. Labor Comm'n*, 2016 UT App 48, ¶ 10, 369 P.3d 462 (explaining that we assess the Commission's findings based upon the record "as a whole" (citation and internal quotation marks omitted)). Certainly, it is not beyond reason that a person who loses control of a wheelbarrow full of gravel while running with it can injure a knee while trying to "catch himself" from falling as the loaded wheelbarrow goes over—or that afterward he might inaccurately describe the precise mechanism of injury.

¶29   Nor has JPL shown that Mondragon's testimony about the incident as a whole was necessarily incredible. Even

assuming that Mondragon's recounting of the mechanism of injury constitutes a type of inconsistency in his testimony, the precise mechanism of internal injury is merely one element in the series of events comprising the industrial incident. *See id.* And apart from the mechanism of injury, Mondragon recounted the other material aspects of the event consistently. He reported at the hearing and to Dr. Britt that he was pushing the wheelbarrow, that he lost control of it, that as it tipped over he felt his knee pop, and that he suffered swelling and pain immediately afterward. And the Commission did not need to merely rely on Mondragon's testimony given at the hearing; as explained, the objective components of Dr. Britt's report support a conclusion that Mondragon had suffered a knee injury.

¶30    Thus, even assuming that Mondragon's testimony and the circumstances surrounding the accident might have permitted the Commission to infer that Mondragon had fabricated the incident, it is "the province of the [Commission], not appellate courts, to resolve conflicting evidence, and where inconsistent inferences can be drawn from the same evidence, it is for the [Commission] to draw the inferences." *EAGALA*, 2007 UT App 43, ¶ 16 (citation and internal quotation marks omitted); *accord Carbon County*, 2013 UT 41, ¶ 6. The ALJ found, and the Commission affirmed, that Mondragon was credible, and we will not disturb that determination. *See Prosper Team, Inc. v. Department of Workforce Servs.*, 2011 UT App 246, ¶ 4 n.2, 262 P.3d 462 ("[W]e never enter into the realm of credibility; the [Commission] is simply in a much better position to judge the credibility of a witness than this court.").

¶31    Finally, although JPL contends that the Commission did not have sufficient evidence to determine that Mondragon was merely confused about the mechanism of injury as opposed to fabricating the incident, the Commission's determination that Mondragon was mistaken about the exact mechanism is more properly characterized as an inference, one that is also inherently

bound up in its credibility determination. *Provo City*, 2015 UT 32, ¶ 8 ("Instead, we defer to an administrative agency's findings because when reasonably conflicting views arise, it is the agency's province to draw inferences and resolve those conflicts." (brackets, citation, and internal quotation marks omitted)). When JPL disproved the mechanism of injury at the hearing, the Commission was required to decide whether Mondragon was nonetheless credible—that is, whether the evidence as a whole suggested that he was lying or was merely mistaken about the exact mechanism about the whole incident. While the Commission acknowledged that Mondragon's description of the precise mechanism of injury was not possible, it determined that Mondragon was generally credible as to the events of the day—i.e., that he was not lying. *See EAGALA*, 2007 UT App 43, ¶ 16. As a result, our conclusion that there was substantial evidence to support the Commission's credibility determination necessarily resolves the question of whether there was substantial evidence to support the Commission's inference that Mondragon was mistaken about the events of the accident rather than dishonest. *See Provo City*, 2015 UT 32, ¶ 8.

¶32 In sum, where "the underlying and dispositive circumstances of the accident were established in the record even though the precise mechanism of injury was not," we conclude that there was substantial evidence to support the Commission's determination that Mondragon was injured through an industrial accident. *See Martinez v. Media-Paymaster Plus*, 2007 UT 42, ¶ 35, 164 P.3d 384.

B.      The Commission as an Advocate

¶33    Relying on *Acosta v. Labor Commission*, 2002 UT App 67, 44 P.3d 819, JPL contends that the ALJ and the Commission improperly advocated on Mondragon's behalf by creating a "new theory of accident" to support the award of benefits— namely, the "significant stress" theory. It argues that, in doing

so, the Commission "improperly awarded benefits on a theory . . . against which JPL had no opportunity to defend." For reasons similar to those already discussed above, we conclude that our decision in *Acosta* does not require a different result.

¶34    In *Acosta*, we upheld the Commission's determination that the ALJ had improperly awarded benefits based on a theory of legal causation not presented by the claimant. *Id.* ¶¶ 31–33. The claimant, a licensed nurse, asserted that, while working in the maternity unit of a medical center, "she felt pain in her back" when she lifted an eight-pound infant from a crib-like structure and "turned to hand the child to its mother." *Id.* ¶ 2. The pain grew worse. She based her claim for temporary workers' compensation benefits on this discrete incident, and the employer countered that her accident did not amount to the sort of "unusual or extraordinary exertion" required to justify an award of compensation in the face of her preexisting back condition under *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986). *See Acosta*, 2002 UT App 67, ¶ 32. In concluding that the claimant satisfied the legal causation requirement, however, the ALJ "relied on a cumulative trauma theory that he raised sua sponte" rather than on the discrete trauma identified by the claimant as the basis for her claim. *Id.* ¶ 4. In particular, the ALJ determined that, while a "single lift of an eight pound baby, . . . considered alone" would not satisfy the extraordinary exertion test, nonetheless the "totality of the circumstances in Acosta's case include much more than this single event, for she had five babies and their respective mothers to care for." *Id.* ¶ 31 (citation and internal quotation marks omitted). The ALJ concluded that "Acosta has shown by a preponderance of the evidence that her aggregated workplace duties caused her injury and exceeded the *Allen* test." *Id.* (citation and internal quotation marks omitted). The Commission reversed, concluding in part that "it was improper for the ALJ to raise the cumulative trauma theory on his own because doing so denied [the respondents] the opportunity to present evidence and challenge [a cumulative

trauma theory] type of claim." *Id.* ¶ 33 (citation and internal quotation marks omitted). The Commission reversed the award of benefits, concluding that the "single lift of one eight pound infant is not enough to satisfy the *Allen* test," which we affirmed. *Id.* ¶¶ 33–35.

¶35    The circumstances here are different. In *Acosta*, the ALJ sua sponte raised a completely new theory of causation to meet that necessary element of Acosta's claim—he decided that, while a single discrete instance of lifting one child could not meet the legal causation requirement, the "totality of the circumstances" in the claimant's case would. Thus, he crafted a new theory of legal causation to substitute for the theory the claimant had advanced. And, in doing so, the ALJ made it impossible for the respondents to prepare an effective defense. In contrast, here, the Commission did not need to create a new theory of accident for Mondragon; even if the precise mechanism of injury was unclear, the circumstances of the incident as a whole, as well as the medical evidence that Mondragon provided, supported an inference that Mondragon's right knee was injured when the wheelbarrow tipped over. Indeed, the ALJ and the Commission determined that, even though the mechanism of injury Mondragon described—the handles hitting and catching his leg—could not have occurred, he was nevertheless injured by the accident. Thus, unlike *Acosta*, the ALJ and the Commission did not have to look beyond the claim and the supporting evidence that Mondragon actually presented to determine that he had suffered an injury through an industrial accident. This case would resemble *Acosta* if the Commission had rested its decision not on the wheelbarrow incident alone, but also on other events that Mondragon did not claim caused his injury. But the Commission did not.

¶36    As a result, we reject JPL's contention that the Commission impermissibly advocated on Mondragon's behalf. The Commission does not act as an advocate by making

inferences supported by substantial evidence and judgments about the credibility of a claimant in fulfillment of its fact finding responsibility. Because the evidence permitted a fair inference that Mondragon's knee was subject to stress as the wheelbarrow tipped over and that Mondragon was credible despite his mistake about the precise mechanism of injury, the Commission's determination that Mondragon had been injured in the incident as a result of "significant stress" resulting from the established events did not amount to advocacy.

¶37　For the same reasons, we are not persuaded that JPL was deprived of fair notice to defend against Mondragon's allegations. From the beginning, Mondragon alleged that his right knee injury occurred when he lost control of the tipping wheelbarrow. And, indeed, JPL defended against Mondragon's claim by asserting that his claim was fraudulent and could not have occurred. In addition, JPL contended, with the support of an independent medical examination, that Mondragon's knee problems were the result of a preexisting condition, not an injury at work. Thus, JPL has not persuaded us that it was unfairly impeded in its defense in this case.

C.　Medical Support and the Medical Panel Referrals

¶38　In addition to arguing that the evidence did not support the Commission's determination that Mondragon had been injured through the industrial accident he described, JPL argues that medical causation was not established where the Commission improperly referred the case to a medical panel. It contends that the Commission sent the case to the medical panel on the basis of the "significant stress" theory, but asserts that, because the medical reports Mondragon submitted relied upon a "rotation-type injury" rather than a stress theory and the rotation-type injury he described was shown to be impossible, those medical reports were "rendered foundationless and cannot be relied upon" to support the Commission's determination that

there was a dispute in the medical evidence regarding medical causation sufficient to refer the case to the panel. JPL claims that, "[b]ecause [the rotation-type injury] theory was disproved, Mondragon's medical support for that theory was invalidated" and that, apart from the medical panel's ultimate conclusions, "[Mondragon] lacked medical support for any other theory of accident." On that basis, JPL claims that those reports therefore could not have supported the Commission's determination that there was a dispute in the medical evidence sufficient to justify referral to a medical panel or that medical causation had been established.

¶39   An ALJ is authorized to "refer the medical aspects of a case . . . to a medical panel." Utah Code Ann. § 34A-2-601(1)(a) (LexisNexis 2015). The regulations regarding use of medical panels provide that "[a medical] panel will be utilized by the Administrative Law Judge where one or more significant medical issues may be involved," which include "[c]onflicting medical opinions related to causation of the injury or disease." Utah Admin. Code R602-2-2(A)(1). At issue here is whether there was a dispute in the medical evidence regarding medical causation. "Whether there are conflicting medical reports is a question of fact. We must uphold the Commission's factual findings if such findings are supported by substantial evidence based upon the record as a whole." *Resort Retainers v. Labor Comm'n*, 2010 UT App 229, ¶ 24, 238 P.3d 1081 (citation and internal quotation marks omitted).

¶40   As discussed above, this case was twice referred to a medical panel. After initially determining that Mondragon had suffered an industrial injury, the ALJ referred the case to a medical panel based upon a determination that there was a conflict in the medical evidence about whether the injury was "the direct result of the accident" and whether further treatment was necessary. The ALJ noted that, while the independent medical examiner that JPL retained believed that Mondragon's

current symptoms resulted from "preexisting degenerative changes" and were not "the direct result of the accident at issue," Mondragon's treating physicians "are recommending treatment and indicate the accident is industrial." On that basis, the ALJ determined that "there are conflicting medical opinions regarding medical causation" and referred the case to the medical panel. After extensively reviewing Mondragon's medical history and examining him, the initial panel report opined that "all [the evidence it reviewed] suggest[ed] an injury to the meniscus." It concluded that "[t]here is a causal connection between the injury suffered in 2012 and the ongoing knee problem" and that Mondragon needed further treatment, including a "right knee arthroscopy."

¶41　The Commission determined on review that "the panel's reasoning [was] based in part" "on a mechanism of injury involving wheelbarrow handles that is inaccurate"—i.e., that the wheelbarrow handles somehow twisted Mondragon's knee. Noting that the record established that "Mr. Mondragon's right knee was subject to stress while the fully loaded wheelbarrow tipped over," the Commission referred the case back to the medical panel to "reconsider the medical aspects of Mr. Mondragon's claim in light of the fact that his right knee was not caught and twisted between the wheelbarrow handles." The medical panel's second report again concluded that "Mr. Mondragon's right knee problems suffered since May 2012 were caused by the described industrial accident" and explained that "[t]he nature of the injury is consistent with those causing meniscal injury." In particular, the panel noted that Mondragon reported that he "felt that he had been hit in the knee," that he "felt a pop inside of the medial knee," and that he experienced "medial tenderness, swelling, and medial pain" after the accident. The panel explained that, as a general matter, "[t]he unfortunate individual suffering [a meniscal] tear reports a sudden pop within the joint, often feeling that he has been struck by something" along with "immediate pain on the side of the

meniscus and swelling within the joint." It also noted that a torn meniscus "seldom heals" on its own and "either has to be removed or repaired." And the panel opined that the kind of accident Mondragon suffered—involving "abnormal," shearing stress placed upon the knee while trying to keep a full wheelbarrow from falling over—is the kind of "mechanism that causes a meniscus to tear." It concluded that the "violent stressful motion type injury," "the prolonged nature" of the pain, and "the findings [and test results] on physical examination" "all suggest [that Mondragon suffered] an injury to the meniscus." As it did in the first report, the panel also stated that further treatment was needed, including an "[a]rthroscopic evaluation."

¶42　To begin with, we are not persuaded that the medical reports Mondragon submitted were rendered foundationless or invalidated simply because, as JPL claims, he reported a precise mechanism of injury to his doctors that was later proven to be impossible. JPL asserts that the dispute in the medical records as to medical causation "was premised wholly upon the presumption of Mondragon's physicians that the mechanism he reported had actually occurred." But JPL provides no support for this assertion; it simply characterizes the alleged mechanism as somehow forming the entire backbone of each medical report, without explaining why. JPL also cites no authority for its proposition that, because one portion of a medical report is drawn into question, the entire report is necessarily "rendered foundationless." And JPL has not even identified in what sense the medical records were rendered foundationless other than simply making the loose assertion that they were because Mondragon had apparently described the mechanism of injury in a way later found to be mistaken. Indeed, the second medical panel report noted that, even if the wheelbarrow handles were not the cause, an injury like Mondragon's was consistent with the sort of strain that could result from the event he described— suggesting that aspects of Mondragon's description of the

injury's mechanism were perhaps not, in fact, wholly mistaken. As a result, JPL has failed to persuade us that the foundation of the medical reports dissolved once Mondragon's wheelbarrow-handles description of the injury was proved mistaken. *See Red Bridge Capital, LLC v. JAR Family Inv. Co.*, 2014 UT App 21, ¶ 8, 319 P.3d 754 (explaining that the Utah Rules of Appellate Procedure require "citation to authority [as well as] development of that authority and reasonable analysis based on that authority" (citation and internal quotation marks omitted)).

¶43    In any event, as we have discussed at length, this question is the kind that the Commission is uniquely positioned to resolve. *See EAGALA, Inc. v. Department of Workforce Servs.*, 2007 UT App 43, ¶ 16, 157 P.3d 334. Like Mondragon's testimony, the medical records are pieces of evidence that the Commission may choose to weigh as it deems appropriate. *See Hutchings v. Labor Comm'n*, 2016 UT App 160, ¶ 29, 378 P.3d 1273 (explaining that it is the Commission's responsibility to assess the medical evidence to make its medical causation determination). And, at best, Mondragon's mistaken description of the precise injury mechanism created a question regarding the extent to which Mondragon's medical records could be relied upon. Certainly, the Commission could have decided that Mondragon's error undermined the value of the medical opinions, but JPL has not demonstrated that such a determination involved more than the sort of weighing of evidence that is the Commission's particular province.

¶44    In this regard, as we have explained above, there was substantial evidence—apart from the medical panel report itself—to suggest that the accident actually occurred and that an injury occurred due to stress being placed on Mondragon's right knee as the full wheelbarrow tilted over, even if Mondragon was mistaken regarding exactly how it happened. As a result, we also necessarily reject JPL's contention that the medical panel report provided the only medical support for the Commission's

medical causation finding. While Mondragon's impression of how the injury occurred was mistaken in the details he described, both treating physicians nonetheless treated him based upon the overarching theory that his right knee was injured when the full wheelbarrow he was pushing tipped over, which was consistently reported to his physicians. Dr. Britt's report went further, stating that Mondragon reported that he was injured as the wheelbarrow tipped over and put "pressure" on his right knee. Further, neither physician simply relied upon Mondragon's description of the mechanism of injury in making their assessments or conclusions as to causation or whether further treatment was required. For example, Dr. Britt conducted objective tests, such as the McMurray test, and examined the knee for swelling, bruising, or other signs of injury, which he found. Likewise, another treating physician, Dr. Andruss performed an examination of Mondragon's knee and also reviewed x-rays and Mondragon's medical history before making his assessment. In other words, neither physician's report was premised entirely upon Mondragon's own description of the mechanism of injury he described. Rather, both physicians formulated their assessment based upon the entire picture presented to them. *Cf. Ernest Health, Inc. v. Labor Comm'n*, 2016 UT App 48, ¶ 10, 369 P.3d 462 (explaining that the evidence should be reviewed based upon the record "as a whole" (citation and internal quotation marks omitted)). And to the extent that the medical records repeated Mondragon's mistaken mechanism of injury, as we have explained, whatever question that may have raised about their reliability was for the Commission to resolve. *See EAGALA*, 2007 UT App 43, ¶ 16.

¶45　In sum, we conclude that there was substantial evidence supporting the Commission's determination that Mondragon was injured in the industrial accident he described, and, notwithstanding the lack of clarity about the precise mechanism of injury, we decline to disturb the Commission's determination that Mondragon was credible. We also conclude that the

Commission did not sua sponte create its own theory of accident and that it did not improperly advocate on behalf of Mondragon. Finally, we conclude that the ALJ's referral of the case to the medical panel was not improper and that the medical panel's report did not form the sole support for the Commission's medical causation finding.

¶46 We now proceed to address JPL's remaining argument that the Commission improperly denied its discovery requests into the claims history of Mondragon's wife and adult son.

## II. Discovery

¶47 JPL finally contends that the Commission abused its discretion when it refused to allow JPL additional discovery into the claims history of Mondragon's wife and adult son. JPL contends that the Commission denied the discovery because JPL "had not submitted the very evidence on fraud and credibility that [it] sought to obtain through the requested discovery." JPL seems to suggest that its "speculation of fraud, based upon the circumstantial evidence," which included the claims history as well as the circumstances of the accident itself, should be sufficient to "cast[] . . . doubt upon the Commission's assumption of Mondragon's confusion." And JPL contends that the Commission's decision "deprived [JPL] of its rights to conduct discovery into this centrally relevant matter."

¶48 The Commission "is afforded broad discretion in determining how best to conduct its inquiry into each case." *Ernest Health*, 2016 UT App 48, ¶ 6. In this regard, the Commission "may make its investigation in such manner as in its judgment is best calculated to ascertain the substantial rights of the parties and to carry out justly the spirit of the [Workers' Compensation Act]." Utah Code Ann. § 34A-2-802(1) (LexisNexis 2015). It may also "receive as evidence and use as proof of any fact in dispute all evidence considered material and relevant." *Id.* § 34A-2-802(2). The Commission's discovery

decisions fit within this broad grant of discretion. *See id.* (listing the various types of evidence the Commission may choose to receive). Accordingly, we will not disturb the Commission's decision not to permit further discovery unless its decision "exceeded the bounds of [its] discretion." *Ernest Health*, 2016 UT App 48, ¶ 7.

¶49    During the proceedings, JPL repeatedly asserted that Mondragon fabricated his claim of injury. It based this assertion upon its characterization of the circumstances surrounding the accident and upon a claims history report it had generated. JPL generated the claims report from, as it states, "a broad search" that included claims filed under "similar names," from the same address, and of the same loss type. It also included claims filed under other types of policies, such as personal automobile policies. And it included only basic information on any matching claim, such as the identification information of the insuring company implicated; the date of loss; the claimant's identifying information; the applicable policy type, such as "personal automobile" or "workers compensation"; the coverage and loss type; the injury type (such as, "inflammation knee" or "contusion to right index finger"); and any other involved party, such as an insured business. It did not include any information about how much was paid out or how each claim had been resolved or any details or notes describing the circumstances of each matched claim. In fact, the report itself did not even identify the potential familial relationships between Mondragon and the other persons whose claims matched based upon the selected criteria—that is, other than the dates of birth or the matching addresses and last names, nothing in the report identified any other persons as actually being Mondragon's adult son or wife. JPL argues that this report raised a sufficient question regarding the veracity of Mondragon's claim to justify additional discovery into the claims history of Mondragon's wife and adult son. Indeed, it contends that the claims report showed that Mondragon and his adult son "had demonstrated a pattern

of filing numerous workers' compensation claims at the same successive prior employers."

¶50    JPL therefore filed a motion early in the proceedings to compel Mondragon to, among other things, provide signed information releases from his adult son and wife. In its motion, JPL did not explain why the releases for Mondragon's wife and son were necessary for resolution of the case. Instead, JPL simply requested that the ALJ compel Mondragon to provide them, along with other discovery responses, such as Mondragon's own release and the initial interrogatories and request for production that JPL served. While the ALJ granted the motion as to Mondragon's release, she refused to compel Mondragon's adult son and wife to provide the information and records releases requested, explaining that there had "been no showing of relevancy," and Mondragon's adult son and wife "are not subject to the jurisdiction of this court." In seeking review of the ALJ's final order awarding Mondragon benefits, JPL attempted to discredit Mondragon by asserting that the claims history search it had conducted revealed that Mondragon and his "adult son had demonstrated [a] pattern of filing workers' compensation claims for multiple same prior employers." JPL stated that it desired "to conduct additional discovery into the veracity of [Mondragon's] claim" because, in its view, the circumstances of the accident along with the "questionable claim history" suggested that Mondragon had "fabricated" the accident. The Commission affirmed the ALJ's order, and JPL then filed a motion for reconsideration in which it renewed its request for discovery into the claims history of Mondragon's adult son and wife. JPL argued that its request for discovery from Mondragon's family members was "wholly relevant and necessary" in light of the fact that, in its view, the ALJ awarded benefits to Mondragon "on the basis of [the] faulty assumption of [his] credibility."

¶51    In its order denying the request for reconsideration, the Board stated that it had reviewed the claims history and the related materials "and found there to be no actual evidence of fraud on Mr. Mondragon's part." It concluded that Mondragon had suffered an injury to his right knee based upon "the medical evidence that Mr. Mondragon sustained a twisting-type injury to his right knee consistent with the strain of carrying a wheelbarrow on the date in question." And it concluded that the "assertion that Mr. Mondragon is not credible and may be committing fraud is no more than speculation." It therefore denied the request for reconsideration.

¶52    We decline to disturb the Commission's decision. JPL essentially argues that the claims history report it submitted combined with its characterization of the circumstances of the accident—including the fact that Mondragon was "allegedly injured within hours of beginning his employment with [JPL]," that the accident was "unwitnessed," and that Mondragon returned to "similar employment" after his injury—cast enough doubt on the veracity of Mondragon's own claim to justify discovery into the claims of his adult son and wife, both nonparties to the claim. And, according to JPL, the Commission abused its discretion by not allowing JPL to do so. But because we have affirmed the Commission's determination that Mondragon was credible and that Mondragon was injured in the accident, we do not address that aspect of this argument further. As we explained, the Commission was entitled to view the evidence about the accident as a whole and make its own inferences and credibility determinations. The Commission also determined that, even including the claims report, JPL had not shown anything more than speculative evidence of fraud. JPL has not demonstrated that this decision exceeded the Commission's discretion. Indeed, the claims report JPL submitted is merely a bare list of claims, identifying only basic information, with no notes describing details of the accidents or the resolutions of the claims.

¶53   Thus, the Commission did not abuse its discretion by concluding that JPL provided "no more than speculation without evidence" that Mondragon "may be committing fraud." The Commission's refusal to order discovery on nonparties under such circumstances is well within its broad discretion. *See* Utah Code Ann. § 34A-2-802(1) (LexisNexis 2015) ("The commission may make its investigation in such manner as in its judgment is best calculated to ascertain the substantial rights of the parties and to carry out justly the spirit of the chapter."). Accordingly, we decline to disturb the Commission's decision to deny JPL's request for additional discovery into the claims history of Mondragon's adult son and wife—two nonparties—on the basis of thinly-supported speculation about a potential pattern of fraudulent workers' compensation claims.

## CONCLUSION

¶54   We conclude that there was substantial evidence to support the Commission's determination that Mondragon suffered an industrial accident, that the Commission did not sua sponte create its own theory of accident or improperly advocate on behalf of Mondragon, and that the referral of the case to the medical panel was not improper. We also conclude that the Commission did not abuse its discretion when it denied JPL's requests to conduct discovery into the claims history of Mondragon's adult son and wife. Accordingly, we decline to disturb the Commission's decision.

—————