2002 UT App 67

**Linda R. ACOSTA, Petitioner,**

v.

**LABOR COMMISSION, Salt Lake Regional Medical Center, and Liberty Mutual Insurance, Respondents.**

**No. 20000162–CA.**

Court of Appeals of Utah.

March 7, 2002.

Gerald J. Lallatin and Sandra N. Dredge, Dredge & Lallatin LC, Provo, for Petitioner.

Alan Hennebold, Labor Commission, Michael E. Dyer, and Kristy L. Bertelsen, Blackburn & Stoll LC, Salt Lake City, for Respondents.

Before Judges DAVIS, GREENWOOD, and ORME.

## OPINION

DAVIS, Judge.

¶ 1 Petitioner Linda Acosta seeks review of a Labor Commission order reversing an Administrative Law Judge's (ALJ) order awarding her workers' compensation benefits. The Commission ruled that because Acosta has a preexisting condition that contributed to her injury, she was subject to the legal causation test enunciated in *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986), and that she did not meet the *Allen* test. We affirm.

## BACKGROUND

¶ 2 Acosta was injured on December 20, 1998, while employed as a licensed practical nurse at Salt Lake Regional Medical Center. Acosta was working in the maternity unit, and after she bent down to lift an eight pound infant out of an isolette, which is similar to a crib, she felt pain in her back as she turned to hand the child to its mother. Acosta's pain grew worse, she was eventually diagnosed with degenerative conditions of the spine, including spinal stenosis, and she required surgery. Acosta had no history of prior back pain.

¶ 3 Acosta filed for workers' compensation benefits, and Respondents Salt Lake Regional Medical Center and Liberty Mutual Insurance Company denied her claim. Acosta filed an application for a hearing in March 1999, and Respondents, in their answer, alleged that Acosta suffered from a preexisting condition and that she failed to satisfy the *Allen* test for legal causation. A formal hearing was held before an ALJ on September 1, 1999.

¶ 4 In an October 1999 order, the ALJ found that Acosta had preexisting but asymptomatic conditions that were discovered after December 20, 1998, that she had never received any treatment for the preexisting back problems, and that, despite the preexisting condition, she had worked continuously for the hospital since 1980. The ALJ concluded that medical causation had been shown by a preponderance of the evidence. The ALJ also concluded that because Acosta's injury was enhanced by the workplace, she did not have to meet the *Allen* test. The ALJ went on though, to conclude that if the *Allen* test were applicable, Acosta had met it. In doing so, the ALJ relied on a cumulative trauma theory that he raised sua sponte. The ALJ awarded temporary total disability benefits from April 1999 through the time in August 1999 when Acosta returned to work part time and temporary partial disability until such time as maximum medical improvement was reached.

¶ 5 Respondents filed a motion for review with the Commission, and the Commission reversed the ALJ in a January 2000 order, ruling that *Allen* applied and that Acosta had failed to meet the *Allen* test for legal causation. In doing so, the Commission noted that the preexisting condition contributed to the injury for which Acosta was seeking benefits. The Commission, quoting from *Allen*, 729 P.2d at 26, concluded that the act of lifting a newborn infant from a crib was not an "unusual or extraordinary exertion over and above the 'usual wear and tear and exertions of nonemployment life.'" The Commission noted that Acosta had relied on a "single, specific work activity" to meet the *Allen* test for legal causation, and stated that it was inappropriate for the ALJ to have raised a cumulative trauma theory to justify an award of benefits.

¶ 6 Acosta filed a timely petition for review in this court. Subsequently, Respondents filed a motion to dismiss the appeal because Acosta's brief was past due. In an August 30, 2000 order, this court, citing Acosta's failure to timely file her brief, ordered the appeal dismissed unless Acosta filed her brief within ten days. During this time period, Acosta was in the process of dismissing her attorney of record and was seeking new counsel. She later filed a pro se motion to

reinstate her appeal, and that motion was granted on September 21, 2000, on the condition that she file her brief within thirty-five days of the order. This order was sent not to Acosta, but to the attorney Acosta was seeking to dismiss, and then the case was prematurely remitted to the Commission on October 18—before the thirty-five day period for Acosta to file her brief had run. Acosta filed another pro se motion, in the form of a letter, on January 12, 2001, explaining her difficulty obtaining counsel and again asking this court to reinstate her appeal. In a January 23, 2001 order, the remittitur was recalled and Acosta's appeal was again reinstated and a briefing schedule was set. Her current counsel then appeared and briefing commenced.

## ISSUES AND STANDARD OF REVIEW

¶ 7 Respondents argue that: (1) this court lacks subject matter jurisdiction because of the October 18, 2000 remittitur, and (2) because the court committed manifest error in reinstating the appeal, the appeal should be dismissed.

¶ 8 Acosta argues that: (1) the *Allen* test is inapplicable in cases of asymptomatic preexisting conditions, and (2) if the *Allen* test is applicable, the ALJ correctly ruled that Acosta met the legal causation standard for preexisting conditions.

¶ 9 "Whether appellate jurisdiction exists is a question of law which [is] reviewed for correctness." *Pledger v. Gillespie*, 1999 UT 54,¶ 16, 982 P.2d 572.

¶ 10 " 'Judicial review of final agency actions is governed by the Utah Administrative Procedures Act.' " *Color Country Mgmt. v. Labor Comm'n*, 2001 UT App 370,¶ 16, 38 P.3d 969, *petition for cert. filed*, Jan. 4, 2002 (quoting *Viktron/Lika Utah v. Labor Comm'n*, 2001 UT App 8,¶ 5, 18 P.3d 519). Under Utah Code Ann. § 63–46b–16(4)(d) (1997), we may grant relief to a party who has been "substantially prejudiced" by an agency that "has erroneously interpreted or applied the law." The *Allen* test is a judicially crafted rule that the Commission is in no better position to interpret than this court; thus, whether the Commission erroneously interpreted the *Allen* decision to apply to asymptomatic preexisting conditions is a question of law reviewed for correctness. *See Esquivel v. Labor Comm'n*, 2000 UT 66,¶ 12–19, 7 P.3d 777; *Morton Int'l, Inc. v. Utah State Tax Comm'n*, 814 P.2d 581, 587 (Utah 1991); *Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 333 n. 5 (Utah Ct.App.1990).

¶ 11 Whether the Commission erroneously applied the *Allen* test is a mixed question of law and fact reviewed for reasonableness and rationality. *See AE Clevite, Inc. v. Labor Comm'n*, 2000 UT App 35,¶ 7, 996 P.2d 1072 ("[T]he Legislature has granted the Commission discretion to determine the facts and apply the law to the facts" and this court will uphold the Commission's determination unless it "exceeds the bounds of reasonableness and rationality.").

## ANALYSIS

¶ 12 Respondents argue we are without jurisdiction to hear this appeal because we dismissed the appeal and the October 18, 2000 remittitur divested us of jurisdiction and returned jurisdiction to the Commission. Respondents cite *State v. Clark*, 913 P.2d 360 (Utah Ct.App.1996), for the proposition that once a party has failed to file a brief as required, the appeal has been dismissed, and the time for a motion for reinstatement under Rule 23A of the Utah Rules of Appellate Procedure has passed, then the court loses jurisdiction and the dismissal is an adjudication on the merits barring a subsequent appeal of the same issues under the doctrine of res judicata. *Clark* is easily distinguishable from the instant appeal because in *Clark*, the court remitted the case to the trial court only after the time had run for the appellant to file a petition for certiorari or to move for reinstatement of the appeal or for a rehearing. *See id.* at 361.

¶ 13 This case is controlled by *Hi–Country Estates v. Foothills Water Co.*, 942 P.2d 305 (Utah 1996) (per curiam). In *Hi–Country Estates*, Foothills Water sought review of our decision in *Hi–Country Estates v. Bagley & Co.*, 863 P.2d 1 (Utah Ct.App.1993), in the Utah Supreme Court by filing a petition for

certiorari, after receiving an extension of time to do so from the supreme court. *See Hi–Country Estates,* 942 P.2d at 305. This court mistakenly remitted the case to the trial court while Foothills's time for seeking review in the supreme court was still pending, and Foothills later petitioned this court to recall the remittitur. We refused, and Foothills unsuccessfully moved the trial court to stay the proceedings pending review in the supreme court. The trial court instead modified its judgment in accordance with our decision. *See id.* at 306. Nearly six months later, the supreme court granted Foothills's petition for certiorari from the modified judgment, for the express purpose of reviewing whether the trial court could properly modify the judgment while a petition for certiorari was pending before it. Our supreme court ruled that this court had "issued its remittitur prematurely, and jurisdiction was *never* returned to the trial court." *Id.* (emphasis added). The supreme court went on to state that, not only had we erred in prematurely remitting the case to the trial court, but we had also erred when we "refused to recall [the] erroneously issued remittitur," and the supreme court ultimately voided the trial court's modification entirely. *Id.* at 307.

¶ 14 Thus, not only was it error to remit the case on October 18, 2000, before the time had run for Acosta to file her brief, but it also would have been error not to recall the remittitur and reinstate the appeal as contemplated by Rule 23A of the Utah Rules of Appellate Procedure.

¶ 15 Respondents contend that it was "manifest error" to reinstate Acosta's appeal based "solely upon [Acosta's] January 12, 2001 ex parte communication." Respondents argue that this court violated their due process rights because they were not notified of Acosta's motion to reinstate nor were they given an opportunity to file a responsive pleading, and they ask that the appeal be dismissed.

¶ 16 We decline to dismiss the appeal on this basis. We can reinstate an appeal "upon motion of the appellant" for any "failure to take a step other than the timely filing of a notice of appeal ... for ... mistake, inadvertence, surprise, or excusable neglect." Utah R.App. P. 23A. Because the remittitur was premature, and in light of our analysis above under *Hi–Country Estates,* we fail to see what possible impact any responsive pleading filed by the Respondents could have had on our decision to reinstate the appeal—which we would readily have done sua sponte had we been the first to discover the error.

¶ 17 We turn to the merits of Acosta's appeal. In order to recover workers' compensation benefits, an employee must prove she was injured "by accident arising out of and in the course of the employee's employment." Utah Code Ann. § 34A–2–401 (1997). *Allen* requires: (1) that the injury be " 'by accident,' " and (2) that " 'there be a causal connection between the injury and the employment.' " *Nyrehn,* 800 P.2d at 334 (quoting *Allen,* 729 P.2d at 18). *Allen* then requires a claimant to show both medical causation and legal causation. In this case, the medical causation and "by accident" components are not at issue. All that is before us is whether Acosta carried her burden of proving legal causation.

¶ 18 Acosta first challenges the Commission's decision that the *Allen* test for proving legal causation where an employee has a preexisting condition applies to asymptomatic preexisting conditions. Acosta urges us to treat claimants with asymptomatic preexisting conditions differently than those claimants with preexisting conditions that were apparent before an industrial accident. Acosta's argument turns primarily on her reading of the words "suffers from" in *Allen,* 729 P.2d at 26.[1] The relevant passage from *Allen* provides: "[W]here the claimant *suffers from* a preexisting condition which contributes to the injury, an unusual or extraordinary exertion is required to prove legal causation." *Id.* (emphasis added). Acosta also points to the following language in *Nyrehn* as support for her contention that the

---

1. Acosta also argues that *Crosland v. Board of Review,* 828 P.2d 528, 532 (Utah Ct.App.1992), supports treating asymptomatic preexisting conditions differently. We do not read *Crosland* to support Acosta's position.

*Allen* test does not apply to asymptomatic preexisting conditions: "An ALJ may not simply presume that the finding of a preexisting condition warrants application of the *Allen* test. An employer must prove medically that the claimant 'suffers from a preexisting condition which contributes to the injury.'" *Nyrehn*, 800 P.2d at 334 (quoting *Allen*, 729 P.2d at 26).

¶ 19 Based on this language, Acosta argues that asymptomatic preexisting conditions do not trigger the *Allen* test because the claimant does not really *suffer* from any symptoms. Acosta relies on a narrow definition of the word "suffer" that includes to experience or to endure pain or affliction. She argues that the word suffer, in the workers' compensation context, refers to "one who has had prior injuries or complaints in the same low back area and has received treatment for that injury or complaint." Acosta then argues that because the word asymptomatic means symptomless, a claimant with an asymptomatic preexisting condition cannot be "suffering from" a preexisting condition when there have been no prior symptoms, treatment or loss of employment. Acosta then concludes from this that if a claimant is not "suffering from" the preexisting condition as she defines it, "then that condition cannot be found to contribute to her injury."

¶ 20 Although this argument is superficially appealing, it must fail for a number of reasons. First, Acosta misreads *Nyrehn* to support her position that asymptomatic preexisting conditions are outside the scope of the *Allen* test. She concludes that because we reversed the Commission in *Nyrehn* and the claimant's preexisting condition was asymptomatic, we must have ruled as we did *because* the preexisting condition was asymptomatic. This is not so. The fact that the preexisting condition was asymptomatic was immaterial to the *Nyrehn* decision. In *Nyrehn*, the Commission had failed to make a required finding of fact—that the preexisting condition contributed to the injury. *See Nyrehn*, 800 P.2d at 334–35. We ruled that this was a threshold finding necessary to make the *Allen* test applicable, although we eventually ruled this was harmless error because the claimant satisfied the strictures of

*Allen* when we considered the cumulative effect of the claimant's workplace duties. *See id.* Thus, we never held that the *Allen* test was inapplicable in *Nyrehn,* let alone that it was inapplicable because the claimant's preexisting condition was asymptomatic.

¶ 21 Second, Acosta's argument that asymptomatic preexisting conditions are outside the *Allen* test depends on her narrow definition of the verb "suffer." In contrast, Respondents maintain that "suffers from" means merely "to have." Respondents point to the context and purpose of the use of the language "suffers from" in *Allen* as supporting their interpretation.

¶ 22 Webster's offers "experience," "undergo," and "bear" as synonyms for "suffer." Webster's Third New International Dictionary 2284 (1986). It also defines "suffer" as "to submit to or endure death, affliction, penalty, or pain or distress"; "to be in a state of disability"; to "be subject to something disabling"; and "to be at a disadvantage." *Id.* These alternative meanings support Respondents' broader reading of the phrase "suffers from" as used by the *Allen* court.

¶ 23 The purpose behind the legal causation test for preexisting conditions announced in *Allen* was to distinguish between injuries that

> coincidentally occur at work because a preexisting condition results in symptoms which appear during work hours without any enhancement from the workplace, and ... those injuries which occur because some condition or exertion required by the employment increases the risk of injury which the worker normally faces in ... everyday life.

*Allen*, 729 P.2d at 25. Or, as stated by Professor Larson, "the object is to distinguish work-connected collapses from those that are due to normal progression of a disease." 2 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 46.03[4], at 46–18 (2001). The underlying purpose served by making this distinction is to prevent awarding benefits where there is not "a sufficient causal connection between

the disability and the working conditions." *Allen*, 729 P.2d at 25.

¶ 24 In further describing preexisting conditions, Larson speaks of *"having* a ... personal disease," and not necessarily of enduring the pain or symptoms associated with a preexisting condition. Larson, *supra* § 46.03[2], at 46–7 (emphasis added). Larson also notes a distinction between a "prior heart weakness" as opposed to a heart that is "previously healthy." *Id.* § 46.03[2], at 46–10. The use of this objective language supports Respondents' position that the *Allen* court, which cited Larson extensively in formulating the legal causation test, did not mean to limit the meaning of the phrase "suffers from" to claimants who subjectively experience pain or symptoms prior to their workplace injury. Instead, this language supports an interpretation of "suffers from" that includes those claimants who simply *have* the preexisting condition—whether or not they experience pain or symptoms.

¶ 25 The concurring opinion of Justice Zimmerman in *Holloway v. Industrial Commission*, 729 P.2d 31, 32 (Utah 1986) (Zimmerman, J., concurring), issued exactly one week after *Allen*, is most helpful in analyzing this question. In focusing on what should be the scope of the inquiry on remand in *Holloway*, Justice Zimmerman wrote:

> I would observe that the preexisting condition of which *Allen* speaks need not be patent; in fact, it need not have been known or knowable to anyone before the injury. The sole question is whether the worker came to the workplace with a condition that increased his risk of injury. If he did and that condition contributed to the injury, then *Allen's* higher standard of legal causation comes into play so as to place that worker on the same footing as one who did not come to work with a preexisting condition. To rule otherwise would create the strong likelihood that a worker who has a preexisting condition and whose virtually inevitable injury simply happens to occur at work will be able to foist the cost of that injury on his em-

ployer when the workplace had little to do with causing the injury.

*Id.* (citation omitted). We believe Justice Zimmerman's concurrence correctly states the law in Utah.

¶ 26 Other jurisdictions have applied a test for legal causation similar to our *Allen* test in cases where the preexisting condition was asymptomatic. *See, e.g., Market Food Distribs., Inc. v. Levenson*, 383 So.2d 726 (Fla. Dist.Ct.App.1980); *Conn v. ITL, Inc.*, 187 Neb. 112, 187 N.W.2d 641, 642–44 (1971) (applying test similar to *Allen* for case of preexisting atherosclerosis with no prior symptoms of heart disease or prior heart attacks). The facts of the *Levenson* case are remarkably similar to those here. In *Levenson*, the employee injured himself on the job when he bent over to pull out a twenty to thirty pound desk drawer. 383 So.2d at 726. The Florida court reversed an award of benefits in that case because Levenson had an asymptomatic preexisting spinal condition—lumbar stenosis—that "had advanced to the point that an injury could have been triggered at any time during a normal torsional movement." *Id.* at 727. In doing so, the Florida court relied on the same passage from Larson cited by our supreme court in *Allen*, and stated a test for legal causation identical to our *Allen* test. *See id.* The Florida court noted that the issue was whether the employee/claimant brought some element of personal risk to the job in the form of a preexisting condition. If so, in order to recover benefits, then he or she must demonstrate an unusual or extraordinary exertion greater than that normally performed in non-employment life. *See id.*

¶ 27 The real issue in cases of preexisting conditions is not whether the claimant has suffered pain, nor is it a problem of proof,[2] it is quite simply a problem of *causation.* When analyzing whether an injury arose out of and in the course of employment, it matters not at all, from the standpoint of legal causation, whether the preexisting condition was symptomatic or asymptomatic. Once

---

**2.** The parties dispute how Acosta's approach would affect proceedings before the Commission. Respondents argue Acosta's interpretation of the word "suffer" would "wreak evidentiary havoc" before the Commission, while Acosta argues this would simply not be the case. Neither party makes a convincing argument on this issue, and we decline to give this issue much weight.

the employer/insurer has shown that there was a preexisting condition that contributed to the injury, that is, that the employee has brought some element of risk of injury to the job him or herself, the *Allen* test applies— whether anyone knew prior to the accident that the condition existed or not. It is simply an objective question that queries whether there was a preexisting condition *in fact*— whether the preexisting condition was ascertained, or ascertainable, is not determinative.

¶ 28 Finally, Acosta's conclusion, that if a claimant is not "suffering from" actual pain and symptoms of a preexisting condition then the condition cannot contribute to the injury, is fallacious. It assumes as a medical necessity that any preexisting condition that could possibly contribute to an injury must be knowable before the injury occurs. The facts of this very case prove the assumption incorrect. Both the ALJ and the Commission found that Acosta had a preexisting condition consisting of spinal stenosis, or narrowing of the spinal canal, and the Commission determined that, "[t]he medical record establishes that this preexisting condition actually contributed to the injury for which she now seeks compensation."

¶ 29 Under the Utah Administrative Procedures Act, we review the Commission's factual determinations to see whether they are "supported by substantial evidence when viewed in the light of the whole record" before us. Utah Code Ann. § 63–46b–16(4)(g) (1997). Substantial evidence has been defined as " 'that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion.' " *U.S. West Communications, Inc. v. Public Serv. Comm'n*, 882 P.2d 141, 146 (Utah 1994) (quoting *Boston First Nat'l Bank v. Salt Lake County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990)).

¶ 30 Here, the medical evidence in the record, expressly relied upon by the Commission, consists of a March 1999 report by Acosta's surgeon, Dr. Robert Hood. Dr. Hood writes: "I do not think there is any question that the severe stenosis seen on [the] MRI is the cause of her symptoms and that it first became symptomatic as a result of the work injury even though she clearly had some pre-existing disease." In addition, a report by Dr. Bart Fotheringham, who examined Acosta in February 1999—prior to her surgery—indicates that

> these degenerative changes [in Acosta's spine] are clearly pre-existing with this having been gradually increasing over multiple years. I suspect, though, that there has been some type of slight disk herniation that then sort of set the patient into her current symptoms. I do not think it would have to be much ... due to the significant stenosis.

These medical reports are adequate to convince us that the Commission's finding that the preexisting condition contributed to the injury is supported by substantial evidence.

¶ 31 Acosta next argues that, even if the *Allen* test applies to her case, the Commission applied the test incorrectly when it reversed the ALJ's ruling. The ALJ, in ruling Acosta had satisfied *Allen*, relied on a cumulative trauma theory. The ALJ, in his order, wrote:

> The single lift of an eight pound baby, turning and handing it to the mother, considered alone, would not constitute an extraordinary exertion under the *Allen* test of legal causation.... The totality of the circumstances in Acosta's case include much more than this single event for she had five babies and their respective mothers to care for. That uncontradicted testimony is supplemented by her deposition which indicates ... that if the mother was breastfeeding, the lifting of a child would be repeated about every two hours, or four times in an eight-hour shift. Of course there would be a second lift from the mother back to the isolette. For five mothers, that would be 40 lifts for feeding alone, and certainly there would be many other lifts for changing, bathing and visitors, probably doubling that number. But even that was only a portion of petitioners [sic] work.... Acosta testified that she had to assist the patients in their total care and activities of daily living, e.g. [but not limited to], helping patients with a C-section up and to the bathroom. Petitioner also testified that she often had to pick

things up from the floor in assisting the mothers.

....

... [E]ven if legal causation is required ..., Acosta has shown by a preponderance of the evidence that her aggregated workplace duties caused her injury and exceeded the *Allen* test.

The Commission, in reversing the award of benefits, cited *Hilton Hotel v. Industrial Commission*, 897 P.2d 352 (Utah Ct.App. 1995), and noted that Acosta had "relied on a single, specific work activity to meet the test of legal causation." The Commission stated it was "inappropriate for either the ALJ or the Commission to raise other theories, such as cumulative trauma or cumulative exertion, to justify an award of benefits."

¶ 32 Respondents argue that the Commission was correct to reverse the award of benefits because Acosta never raised a cumulative trauma theory, it was improper for the ALJ to do so sua sponte, and the single lifting of a small child to chest height is not an unusual or extraordinary exertion under *Allen*.

¶ 33 We agree with Respondents that the Commission acted reasonably and rationally in its application of the law to the facts of this case in reversing the ALJ's award of benefits. First, as noted by the Commission, under *Hilton Hotel*, it was improper for the ALJ to raise the cumulative trauma theory on his own because doing so denied Respondents "the opportunity to present evidence and challenge this type of claim." 897 P.2d at 356. Acosta, in her pleadings and correspondence, failed to raise the cumulative trauma or cumulative exertion she experienced in her workplace.[3] Instead, she relied on the one specific instance on December 20, 1998, when she lifted one eight pound infant and turned to hand the child to its mother.

Second, a single lift of one eight pound infant is not enough to satisfy the *Allen* test. In fact, the *Allen* court itself, in listing examples of ordinary exertions of nonemployment life, specifically mentioned that "lifting a small child to chest height" was a "typical nonemployment activit[y] ... generally expected in today's society." *Allen*, 729 P.2d at 26.

¶ 34 Hence, because Acosta cannot rely on a cumulative trauma theory, and the *Allen* court itself specifically rejected lifting a small child to chest height as an unusual or extraordinary exertion, the Commission acted reasonably and rationally in denying her claim for workers' compensation benefits.

## CONCLUSION

¶ 35 We conclude that we have jurisdiction to consider the merits of Acosta's appeal. We conclude that the Commission was correct in ruling that the *Allen* test for legal causation for preexisting conditions does apply to Acosta's asymptomatic preexisting condition. We also conclude that the Commission's ruling that Acosta did not meet the *Allen* test was reasonable.

¶ 36 Affirmed.

¶ 37 WE CONCUR: PAMELA T. GREENWOOD and GREGORY K. ORME, JJ.

---

**3.** In her "First Report of Injury," filed with the Commission, Acosta, in answering how the injury occurred, replied: "Lifting *a* baby to crib, twisted back." (Emphasis added.) She also named a specific date, December 20, 1998, and a specific time of the occurrence, 10:00 a.m. In the "Physician's Initial Report," also filed with the Commission, under the section captioned "Employee's Statement of Cause of Injury," is written: "Lifting *an* infant from an isolette." (Emphasis added.) In her application for hearing, Acosta described the accident occurring as follows: "I was lifting a baby out of an isolet [sic] to hand to its mother."

Just as in *Hilton Hotel v. Industrial Comm'n*, 897 P.2d 352, 356 (Utah Ct.App.1995), the way this injury was characterized by the claimant precluded the ALJ from raising a cumulative trauma theory sua sponte.