2021 UT App 44

## THE UTAH COURT OF APPEALS

JBS CARRIERS AND AMERICAN ZURICH INSURANCE COMPANY,
Petitioners,

*v.*

LABOR COMMISSION AND DAVID HICKEY,
Respondents.

Opinion
No. 20200226-CA
Filed April 15, 2021

Original Proceeding in this Court

Brad J. Miller and Rachel M. Konishi,
Attorneys for Petitioners

Gary E. Atkin and Kenneth E. Atkin,
Attorneys for Respondent David Hickey

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1      While on a long-haul trip as a truck driver for JBS Carriers (JBS), David Hickey developed a blood clot in his left leg, parts of which eventually migrated to his lungs. He later sought, and was awarded, workers' compensation benefits for pulmonary and left leg problems associated with the blood clot. JBS and its insurer seek judicial review of that award, contending that Hickey's employment was not the legal cause of his injuries, and that the Utah Labor Commission (the Commission) improperly determined otherwise. We agree with JBS, and therefore we set aside the Commission's order and remand the case to the Commission for further proceedings.

BACKGROUND[1]

¶2     One evening in August 2016, Hickey began a multi-day trip driving a commercial truck from Utah to California for JBS, his employer since 2013. Hickey's truck was outfitted with an automatic transmission, meaning that Hickey could operate the vehicle without using his left foot to depress a clutch. The truck also came equipped with a sleeper cab, which Hickey could use for rest breaks. On the first evening of the trip, Hickey drove for thirty-seven minutes before stopping for fuel, then drove for another two hours before stopping to sleep in his cab. On the second day of the trip, Hickey drove for two short stretches in the morning, took an eight-hour rest in his sleeper cab, and then drove for just over seven hours without interruption, arriving at his first destination after midnight on the third day of the trip. At this destination, Hickey's truck was unloaded, and he rested there for about eighteen hours before driving another two hours to a second destination.

¶3     By the end of the third day of the trip, Hickey started feeling "dehydrated and not well," and began experiencing shortness of breath, which increased with movement, and "swelling in his left leg." After arriving at his second destination, Hickey went to a local hospital where he was diagnosed with "acute DVT of the lower left extremity." DVT stands for "deep vein thrombosis," which is a medical condition caused by the development of a blood clot in a vein deep inside the body. *See Deep Vein Thrombosis*, WebMD, https://www.webmd.com/dvt/what-is-dvt-and-what-causes-it [https://perma.cc/4PKC-3KKU]. In Hickey's case, parts of the blood clot that had originally formed

---

1. "In reviewing an order from the Commission, we view the facts in the light most favorable to the Commission's findings and recite them accordingly." *JBS USA v. Labor Comm'n*, 2020 UT App 86, n.1, 467 P.3d 905 (quotation simplified).

in a vein in his left leg had broken off and migrated into the blood vessels in his lungs, causing "severe bilateral pulmonary emboli." Pulmonary embolism occurs when a blood clot "that travel[s] to the lung from deep veins in the legs" causes a blockage in one of the lungs' pulmonary arteries. *See Pulmonary embolism*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pulmonary-embolism/symptoms-causes/syc-2035464 7 [https://perma.cc/92KV-PBJV]. DVT coupled with pulmonary embolism is a life-threatening condition, and doctors therefore admitted Hickey to the hospital for treatment, where he remained for three days. Upon discharge, hospital physicians gave Hickey anticoagulants, referred him to his primary medical doctor, and counseled him to lose weight; at the time, he weighed over 340 pounds and had a body mass index of 55, and was thus considered medically "super obese." Hickey had also developed DVT on another occasion some twenty-five years earlier; on that occasion, the DVT occurred after a surgical procedure.

¶4 After being discharged from the California hospital, Hickey was not cleared to return to commercial truck driving for three months. In the interim, Hickey applied for temporary total and permanent partial workers' compensation benefits. In his application, Hickey claimed that he sustained an industrial injury—the DVT and resulting embolism (the Injury)—"[d]ue to long periods of sitting in a truck" in August 2016. He did not claim to have sustained the Injury from repetitive trauma. JBS responded by asserting that there existed no causal link—either medical or legal—between Hickey's employment and the Injury, and contended that the Injury "constitute[d] nothing more than the continuing manifestation of a pre-existing condition." After two doctors assessed Hickey and gave conflicting opinions about whether Hickey suffered from a preexisting condition that contributed to the Injury, an administrative law judge (ALJ) referred the matter to a medical panel.

¶5 The doctors on the panel reviewed the relevant medical records, as well as certain facts to which Hickey and JBS had stipulated, and concluded that the "primary factor" that led to the Injury was Hickey's "super obesity." The panel acknowledged that Hickey's "work as a commercial truck driver . . . did marginally worsen" his DVT and pulmonary embolism, but opined that Hickey's "super obesity made him 6-10 times more likely to develop a blood clot." The panel concluded by stating that it did "not believe there [was] a 1:1 contribution" to the Injury from his super obesity and from his long-haul journey, because obesity is a more significant DVT risk factor than commercial truck driving.

¶6 Relying on the medical panel's report, which he found "thorough and well-reasoned," the ALJ denied Hickey's claim for benefits. In so doing, the ALJ first determined that Hickey suffered from a preexisting condition—super obesity—and that this condition "contributed to the development of [Hickey's] blood clots." He then concluded, citing *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986), that Hickey's work-related activities—which the ALJ characterized as "spending long periods of time sitting . . . without using his left foot"—did not qualify as the legal cause of the Injury under Utah law, because those activities were "not . . . unusual or extraordinary" exertions. *See id.* at 26.

¶7 Hickey then asked the Commission to review the ALJ's decision. In Hickey's motion for review, he raised two main arguments: (1) that the medical panel was not qualified to render its decision; and (2) that the ALJ erroneously concluded that a preexisting condition contributed to the Injury, and that Hickey should therefore not have been required to meet the *Allen* standard for legal causation. Notably, Hickey did not make any argument, in the alternative or otherwise, that he could satisfy the *Allen* standard in the event it applied to his case; specifically, he did not attempt to claim that sitting for long periods of time

while driving his truck during the August 2016 trip was an unusual or extraordinary exertion that would satisfy *Allen*.

¶8     After review, the Commission found it unnecessary to address the threshold question of whether Hickey suffered from a preexisting condition that contributed to the Injury, because it determined, sua sponte, that "even if the more stringent [*Allen*] standard applies to Mr. Hickey's claim, he me[t] such standard in light of the work activity that precipitated [the Injury]." The Commission relied on its own precedent to conclude that the activity of "driving for more than six hours without a break and then driving for almost two and a half hours more later in the same day involves an unusual or extraordinary exertion." The Commission then set aside the ALJ's order, and remanded the matter to the ALJ for additional proceedings.

¶9     On remand, the ALJ issued a second order that reaffirmed its earlier conclusion that Hickey suffered from a preexisting condition that contributed to the Injury, but also concluded—as determined by the Commission—that Hickey could show both legal causation and medical causation. The ALJ therefore awarded Hickey the benefits he requested.

¶10    JBS appealed the ALJ's second decision to the Commission, arguing that the Commission overstepped its bounds by sua sponte evaluating legal causation under the *Allen* standard, and asserting that Hickey could not meet that standard in any event. The Commission rejected JBS's arguments. With regard to legal causation, the Commission concluded that driving a commercial truck is unlike typical nonemployment activities, such as personal travel or watching television for long periods of time, because commercial truck driving gives the worker "limited opportunity" to move and is "more complex and demanding than operating or traveling in a personal automobile." The Commission therefore affirmed the ALJ's award of benefits to Hickey.

ISSUES AND STANDARDS OF REVIEW

¶11 JBS now seeks judicial review of the Commission's award, and asks us to examine two particular aspects of the Commission's decision, both of which concern legal causation. First, JBS asserts that, by failing to raise the issue in his first motion for review before the Commission, Hickey failed to preserve (or waived his right to seek review of) the question of whether long-haul truck driving constitutes an unusual or extraordinary exertion under *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986), and asserts that the Commission overstepped its bounds by addressing the issue sua sponte. Second, JBS challenges the merits of the Commission's legal causation determination, asserting that the Injury was not the result of any unusual or extraordinary workplace exertion.

¶12 We need not tackle the first issue, however, because we ultimately agree with JBS on the merits of the legal causation question. Accordingly, in this case we exercise our prerogative to presume, without deciding, that the *Allen* issue was preserved and that the Commission did not overstep its bounds by addressing it.[2] *See State v. Kitches*, 2021 UT App 24, ¶ 28

---

2. We also note some dissatisfaction with the parties' briefing on the question of whether, and under what circumstances, the Commission may consider an issue sua sponte. Neither party cited or discussed *Hilton Hotel v. Industrial Commission of Utah*, 897 P.2d 352 (Utah Ct. App. 1995), or *Chevron U.S.A., Inc. v. Utah State Tax Commission*, 847 P.2d 418 (Utah Ct. App. 1993), *disapproved of on other grounds by King v. Industrial Commission of Utah*, 850 P.2d 1281, 1284 (Utah Ct. App. 1993), a line of cases in which we held that administrative tribunals' ability to consider new issues sua sponte is limited. *See Hilton*, 897 P.2d at 356–57; *Chevron*, 847 P.2d at 420–21. Moreover, neither side discussed the potential tension between that line of cases and other cases

(continued…)

(explaining that, in the interests of judicial economy, "if the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation"). We therefore proceed directly to the merits of the legal causation question, and confine our analysis to the second issue JBS raises.

¶13 With regard to that second issue, we review the Commission's legal causation determinations nondeferentially. *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 40, 308 P.3d 461 (stating that "the Commission's decision here that [the employee] failed to establish legal cause warrants nondeferential review" because "the ultimate question is the legal effect of the facts," a question that "depends on the[] unusualness" of "a

───────────────

(…continued)

indicating that district courts (and, by extension, administrative tribunals) may, under some circumstances and provided that briefing opportunities are afforded to the parties, consider matters sua sponte, *see Doyle v. Doyle*, 2011 UT 42, ¶ 52, 258 P.3d 553; *cf. Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 42, 361 P.3d 63 (determining that there is no preservation problem "[w]here a district court itself raises and then resolves an issue sua sponte," because in such a situation the court "obviously had an opportunity to rule on the issue"), and between that first line of cases and the apparent obligation of courts and administrative tribunals to act sua sponte to avoid plain error, *see, e.g., Utah Chapter of Sierra Club v. Air Quality Board*, 2009 UT 76, ¶¶ 26–28, 226 P.3d 719 (explaining that an administrative agency can commit plain error if it fails to address, sua sponte, an "obvious" and "harmful" error). Under these circumstances, and given that we adjudge the Commission's decision incorrect on its merits, we deem it particularly appropriate to save for another day a thorough discussion of whether, and under what circumstances, the Commission may address issues sua sponte.

given set of facts," and "unusualness—like reasonableness—is an objective legal standard that we are in a better position to analyze than the Commission" (quotation simplified)).

## ANALYSIS

¶14 The Utah Workers' Compensation Act provides that an employee injured "by accident arising out of and in the course of the employee's employment . . . shall be paid . . . compensation for loss sustained on account of the injury." Utah Code Ann. § 34A-2-401(1)(a) (LexisNexis 2019). Interpreting this language in a previous iteration of the same statute, our supreme court has noted that there are "two prerequisites for a finding of a compensable injury" in workers' compensation cases. *See Allen v. Indus. Comm'n*, 729 P.2d 15, 18 (Utah 1986). "First, the injury must be 'by accident.'" *Id.* (quotation simplified). "Second, the language 'arising out of [and] in the course of employment' requires that there be a causal connection between the injury and the employment." *Id.* (quotation simplified). In this case, JBS does not assert that the Injury occurred other than "by accident," and therefore only the second prerequisite—regarding causal connection—is at issue here.

¶15 Our supreme court has "adopted a two-part test for establishing a causal connection"; that test requires a claimant to "establish that the conditions or activities of [the] job were both the medical cause and the legal cause of [the] injury." *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 45, 308 P.3d 461. In instances where no preexisting condition contributes to the injury, a claimant "need only prove medical causation." *Id.* (also stating that, for claimants without preexisting conditions, "the medical and legal causation requirements are one and the same"). But in cases where a worker's preexisting condition contributes to the workplace injury, the worker must also show that the workplace activities were the legal cause of the worker's injuries. *See id.* ¶¶ 45–46.

¶16 In this case, the ALJ in an initial ruling determined that Hickey had a preexisting condition—super obesity—which contributed to his blood clot, and therefore determined that Hickey needed to show legal causation in order to recover. The ALJ then concluded that Hickey could not make that showing, and on that basis rejected Hickey's claim for benefits. The Commission, in reviewing the ALJ's decisions, determined that it did not need to grapple with the threshold factual question about whether Hickey had a preexisting condition that contributed to his injuries, because it determined that Hickey could make the necessary showing of legal causation in any event. On that basis, the Commission reversed the ALJ and eventually sustained Hickey's claim.

¶17 In our analysis, given that we review the Commission's decision and not the ALJ's, *see* Utah Code Ann. § 34A-2-801(9)(a) (stating that we review "the decision of the commissioner or Appeals Board"), we begin by examining the merits of the Commission's decision about whether Hickey can satisfy the *Allen* standard for legal causation. Because we determine that he cannot, it then becomes necessary to discuss the threshold question the Commission avoided: whether Hickey even needs to show legal causation in the first place. Our analysis proceeds in that order.

A

¶18 As our supreme court has explained, a "heightened showing of legal cause is necessary" in cases where an employee's preexisting condition contributes to the injury. *See Murray*, 2013 UT 38, ¶ 46 (quotation simplified). This heightened showing serves "to distinguish those injuries which (a) coincidentally occur at work because a preexisting condition results in symptoms which appear during work hours without any enhancement from the workplace, and (b) those injuries which occur because some condition or exertion *required by the*

*employment* increases the risk of injury which the worker normally faces in [the worker's] everyday life." *Allen*, 729 P.2d at 25 (emphasis added). This distinction is important because "[o]nly the latter type of injury is compensable." *Id.* In many cases, "the required workplace enhancement" can be "supplied by" demonstrating that the conditions of employment required "an exertion greater than that undertaken in normal, everyday life." *See Murray*, 2013 UT 38, ¶ 47 (quotation simplified); *see also Allen*, 729 P.2d at 25 (stating that, to show legal causation, an employee must "show that the employment contributed something substantial to increase the risk [the employee] already faced in everyday life because of [the preexisting] condition").

¶19    Evaluating the merits of a worker's legal causation claim involves a two-step process: "first, we must characterize the employment-related activity that precipitated the [employee's] injury, taking into account the totality of the circumstances; and second, we must determine whether this activity is objectively unusual or extraordinary." *Murray*, 2013 UT 38, ¶ 48. The first step is a factual inquiry, *id.* ¶ 49, and in this case does not involve a matter of dispute. The Commission described the relevant portion of Hickey's employment activity as "driving for more than six hours without a break and then driving for almost two and a half hours more later in the same day." Additionally, the Commission noted that Hickey's truck "had an automatic transmission that did not require use of his left leg to engage the truck's pedals," and noted that Hickey "would usually remain in the driver's seat as his truck was being loaded and unloaded," which meant "that his driving time alone did not fully account for the time he spent sitting in the truck." However, no party offered any evidence that Hickey's employment duties required him to drive for any particular length of time before taking a break. And although operation of his particular truck did not necessitate the use of his left leg, Hickey offered no evidence that his employment duties required him to keep his leg motionless while driving. Likewise, although Hickey testified that he

usually remained inside the cab of his truck during loading and unloading, the only evidence he offered in this regard was that "[s]ome shippers and receivers had rules in place [that] required the driver to remain inside the truck" during loading and unloading. The record before us contains no evidence that the shippers and receivers on this particular trip required him to stay in the truck while it was being loaded and unloaded, and in any case the record contains no evidence that he was at any point prevented from moving about inside the truck—for instance, to stretch in place, or to move into the sleeper cab to rest or stretch—during loading and unloading.[3]

¶20   The second step in evaluating a worker's legal causation claim is to compare the level of exertion required by the worker's employment duties to the "typical nonemployment activities [that] are generally expected of people in today's society." *Id.* ¶ 48 (quotation simplified). If the activities and exertions required by the worker's job, viewed in their totality, are objectively unusual or extraordinary when compared to the activities of daily living, then the workplace activities will be considered to have "contributed something substantial to increase the risk [the employee] already faced in everyday life because of [the preexisting] condition," and therefore the workplace activities will be considered the legal cause of the

---

3. In describing the workplace activity that led to the Injury, we focus on the August 2016 trip that Hickey identified, in his application for benefits, as the source of the Injury. As noted, Hickey's claim was that the Injury was caused by *this* trip, and not by the cumulative effect of repetitive lengthy truck travel. Our focus is therefore on the particulars of the specific trip in question. *See Acosta v. Labor Comm'n*, 2002 UT App 67, ¶¶ 31–34, 44 P.3d 819 (declining to address any repetitive trauma claim where the claimant had not raised any such claim, and instead focusing on the specific issue raised by the claimant).

employee's injury. *See Allen*, 729 P.2d at 25; *see also Murray*, 2013 UT 38, ¶¶ 47, 52–53.

¶21 By way of example, our supreme court noted in *Allen* that "[t]ypical activities and exertions expected" of people in modern life "include taking full garbage cans to the street, lifting and carrying baggage for travel, changing a flat tire on an automobile, lifting a small child to chest height, and climbing the stairs in buildings." *See* 729 P.2d at 26; *see also Murray*, 2013 UT 38, ¶ 53 (stating that "people are generally expected to travel in everyday life"). On the other hand, "Utah courts have deemed employment activities to be 'unusual' or 'extraordinary' when they require an employee to endure jumping, lifting great weight, or repetition." *Murray*, 2013 UT 38, ¶ 51; *see also Fastenal v. Labor Comm'n*, 2020 UT App 53, ¶¶ 2, 17, 463 P.3d 90 (determining that a truck driver's repeated use, over a period of more than a year, of his left foot to depress a clutch when driving "for approximately eleven hours per day" on his workdays, constituted unusual and extraordinary exertion, and was the legal cause of a "pressure ulcer" on the driver's left heel). Indeed, even activities that might otherwise seem rather typical may be deemed "unusual or extraordinary" when the requirements of a job demand that an employee execute the activities in an "awkward manner," *see Peterson v. Labor Comm'n*, 2016 UT App 12, ¶¶ 15–16, 367 P.3d 569 (determining that lifting a "significant amount of weight" in an "awkward manner" can constitute unusual or extraordinary activity), or under "exigent circumstances," *see JBS USA v. Labor Comm'n*, 2020 UT App 86, ¶¶ 16–19, 467 P.3d 905 (explaining that a forty-inch jump "constituted an unusual exertion" because "the exigent circumstances surrounding the jump caused" the employee to jump in an abnormal manner).

¶22 Here, the Commission determined that Hickey's activities—driving for some seven hours in one sitting, then driving for another two and a half hours after a break, all

without using his left leg—"involved an unusual or extraordinary exertion over and above the usual wear and tear and exertions of nonemployment life." In so doing, the Commission rejected JBS's arguments that "driving a truck for extended hours was comparable to driving a personal automobile for extended hours," taking a long international flight, or "watching television for an extended amount of time."[4]

---

4. In reaching its determination, the Commission relied heavily on its own precedent. *See Huskic v. Anexpress LLC*, No. 08-0816, 2010 WL 8727461 (Utah Labor Comm'n May 25, 2010). In that case, the Commission held that a driver who was in a truck for "a total of 15 hours straight," "first riding in the passenger's seat and then driving," before suffering a stroke, had engaged in an "unusual or extraordinary exertion"; the Commission determined that "driving a semi-truck . . . is more demanding and involved than driving a personal automobile." *Id.* at *1, *3. Here, in evaluating Hickey's claim, the Commission was bound to follow its earlier precedent. *See Steiner Corp. v. Auditing Div. of Utah State Tax Comm'n*, 1999 UT 53, ¶ 12, 979 P.2d 357 ("The holding of an agency adjudication, or the application of a rule of law to the facts in that case, binds an *agency* in subsequent decisions . . . ." (emphasis added)). But we, of course, are not so bound. *Cf. Ellis-Hall Consultants v. Public Service Comm'n*, 2016 UT 34, ¶¶ 24–33, 379 P.3d 1270 (holding that "agency decisions premised on pure questions of law," while binding on the agency itself, are "subject to non-deferential review" by the judiciary, because "it is emphatically the province and duty of the judicial department to say what the law is" (quotation simplified)); *see also* Utah Code Ann. § 63G-4-403(4)(d) (LexisNexis 2019) ("The appellate court shall grant relief . . . if, on the basis of the agency's record, it determines . . . the agency has erroneously interpreted or applied the law . . . ."). And, for the reasons discussed herein, we find the Commission's analysis in *Huskic* unpersuasive, at least as applied to this case.

The Commission opined that "driving a truck is more complex and demanding than operating or traveling in a personal automobile," and stated that Hickey had "limited opportunity . . . to stretch, change position, or otherwise move about as one would be able to while on a long flight or watching television."

¶23   We disagree with the Commission's analysis. We first take issue with the Commission's statement that Hickey had "limited opportunity" to stretch, change position, or take breaks. There is simply no evidence, in the record before us, to support that conclusion. As evidenced by the work logs, Hickey was allowed to take breaks, and did so often while en route to his assigned destinations; indeed, Hickey took more than two full days to travel from Utah to California, indicating that his delivery schedule was flexible. Hickey presented no evidence that JBS put limits on how often, and for how long, he could stop for a rest or stretch break; likewise, he presented no evidence that the delivery requirements of the trip in question made it impractical to take breaks. And while Hickey testified that he "would usually remain in the driver's seat as his truck was being loaded and unloaded," there is no evidence in the record indicating that this was required of him on this particular trip, or that he was otherwise prevented from moving around inside his truck, including resting inside the sleeper cab, while his truck was being loaded. And finally, while it is certainly true that Hickey's truck had an automatic transmission, and therefore had no clutch that required action by Hickey's left foot, it is also true that no requirement of the job prevented Hickey from stretching his inactive left leg while operating the truck with his other limbs. Under *Allen*, we must focus on the "exertion *required by the employment*." *See* 729 P.2d at 25 (emphasis added). And here, at least according to the record before us, the requirements of the job left Hickey free to take regular breaks, and did not require Hickey to sit entirely still for any particular length of time.

¶24 Next, and relatedly, we disagree with the Commission's determination that Hickey's activities on the trip that precipitated the Injury were materially different from activities typically undertaken by people in modern life. *See id.* at 26. While we acknowledge that operating a commercial truck is somewhat more complicated than driving a personal automobile, it is not the complexity of the activity that forms the basis for Hickey's claim here—instead, it is the sedentary nature of long drives. And in this sense, we perceive no meaningful distinction between sitting for a long time in a truck cab and sitting for a long time in a passenger car, or sitting for a long time in an airplane seat, or even sitting for a long time on a couch in front of a television screen. It is not at all unusual or extraordinary for people in everyday modern American life to take long drives (say, Salt Lake City to Denver, Los Angeles, or Phoenix) in passenger cars. And—at least before the onset of the COVID-19 pandemic—it was not at all unusual or extraordinary for people to take long-haul flights from the U.S. to, say, Europe or Asia. And, in a world where "binge-watch" is now a defined term in the Cambridge English Dictionary, *see Binge-watch*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dicti onary/english/binge-watch [https://perma.cc/RB4V-TDHH], we do not perceive it as unusual or extraordinary for people in everyday life to sit sedentarily for several hours in front of a television or computer screen.

¶25 In the end, when we view the requirements of Hickey's employment during the trip in question, in their totality, we perceive nothing unusual or extraordinary beyond the activities experienced by ordinary people in everyday life "that could be presumed to have contributed something substantial to increase the risk of injury." *Murray*, 2013 UT 38, ¶ 53 (quotation simplified). Accordingly, the Injury Hickey sustained was not legally caused by the requirements of his employment with JBS, and we set aside the Commission's decision to the contrary.

B

¶26　But our determination that the Injury was not legally caused by the requirements of Hickey's job brings back to the fore the threshold question that the Commission, given its legal causation determination, did not answer: does Hickey even need to prove legal causation? If no preexisting condition contributed to the Injury, then he does not; in that event, a simple showing of medical causation will suffice. *See id.* ¶¶ 45–46; *see also Cox v. Labor Comm'n*, 2017 UT App 175, ¶¶ 16, 18, 405 P.3d 863 (explaining that medical causation requires an employee to show that the workplace injury was "*a* cause—as opposed to *the* cause—of the condition requiring treatment").

¶27　In this case, the Commission made no findings or conclusions regarding this threshold question, declining to reach it given its conclusion that Hickey could make the necessary legal causation showing if he had to. But the ALJ did address the threshold question, specifically finding, based largely on the medical panel's report, that Hickey suffered from a preexisting condition—super obesity—and that this condition "contributed to the development of [Hickey's] blood clots."

¶28　We do not directly review the decisions of an ALJ; instead, as noted above, we review the decisions of the Commission. *See* Utah Code Ann. § 34A-2-801(9)(a) (LexisNexis 2019) (stating that we review "the decision of the commissioner or Appeals Board"); *see also Par Elec. v. Labor Comm'n*, 2017 UT App 169, ¶¶ 24–25, 405 P.3d 842 (noting that we review the Commission's decision, not the ALJ's, and rejecting an appellate argument because it took issue with the ALJ's reasoning and did not directly "address the Commission's reasoning"). In this case, our determination that the Commission erred in its legal causation ruling requires us to remand the case to the Commission to consider the threshold question of whether Hickey must even prove legal causation, and in grappling with

that question the Commission will need to decide whether to adopt the ALJ's finding that Hickey suffered from a preexisting condition that contributed to the Injury. The Commission is, of course, free to reject the ALJ's finding and make its own different or contrary finding. *See* Utah Code Ann. § 34A-1-303(4)(a) (stating that the Commission may, among other things, "reverse the findings" of an ALJ); *see also JP's Landscaping v. Labor Comm'n*, 2017 UT App 59, ¶ 13, 397 P.3d 728 ("The Commission is the ultimate fact finder in workers' compensation claims."). Nevertheless, in the interest of judicial economy, we elect to briefly address the ALJ's finding here, in the event that the Commission, on remand, decides to adopt it.

¶29 The burden of making the threshold showing—that legal causation is even at issue—falls to the employer, who must "prove medically that the claimant suffers from a preexisting condition which contributes to the injury." *Utah Auto Auction v. Labor Comm'n*, 2008 UT App 293, ¶ 11, 191 P.3d 1252 (quotation simplified). While there is no "brightline rule regarding this evidentiary threshold," the medical evidence must show that the preexisting condition actually did contribute to the injury, and not just indicate "a possibility" that it might have. *See id.* ¶¶ 12–14 (quotation simplified). Because this is a factual issue, any finding in this regard must be "supported by substantial evidence." *Acosta v. Labor Comm'n*, 2002 UT App 67, ¶ 29, 44 P.3d 819 (quotation simplified).

¶30 In our view, the ALJ's finding—that Hickey suffered from a preexisting condition that contributed to the Injury—was supported by substantial evidence, and a similar finding from the Commission, if based on the same record, would be too. As noted, the ALJ's finding was based largely on the report submitted by the medical panel, which evaluated Hickey, reviewed conflicting medical opinions and medical records, and considered studies regarding DVT in super obese individuals. The panel concluded that the "primary factor" that led to the

Injury was Hickey's "super obesity." It acknowledged that Hickey's work as a long-haul truck driver was also a risk factor, and "did marginally worsen" his DVT and pulmonary embolism, but nevertheless concluded that Hickey's "super obesity made him 6-10 times more likely to develop a blood clot." The panel analyzed the relative contributions to the Injury from Hickey's super obesity and from Hickey's employment as a long-haul trucker, and concluded that it did "not believe there [was] a 1:1 contribution" to the Injury from his super obesity and from his long-haul journey, because super obesity is a more significant DVT risk factor than commercial truck driving.

¶31    Hickey asserts that the medical panel's statements are too inconclusive to form the basis for a solid factual finding. In support of his position, Hickey cites *Utah Auto Auction*, a case in which we determined that medical evidence pointing only to "a possibility" that preexisting conditions contributed to the accident was not enough to trigger the requirement that a worker demonstrate legal causation. *See* 2008 UT App 293, ¶ 14 (quotation simplified). Hickey points to the conclusion reached by his expert witness, who opined that Hickey's blood clot was caused by his long drive, and asserts that his expert's "clear" statement is the only actual evidence in the record regarding whether a preexisting condition actually contributed to the Injury. But the ALJ interpreted the panel's report as making a "determin[ation]" that Hickey's "super obese preexisting medical condition" actually "contributed to the development of" his blood clots and DVT, rather than merely concluding that it might have contributed. And this interpretation was a reasonable one, supported by the language of the panel's report, in which the panel compared the "contribution[s]" made to the Injury from both Hickey's preexisting obesity and his long truck ride, and concluded that Hickey's obesity had made a greater contribution. This contrasts sharply from the situation in *Utah Auto Auction*, in which the medical opinion at issue consisted of "equivocal and inconclusive statements," and did not include a

conclusion regarding the existence of a preexisting condition, much less its contribution to an injury. *See id.*

¶32    After evaluating the conflicting medical opinions and the panel's report, the ALJ gave weight to the panel's report because he considered it "well-reasoned" and "the product of a thorough, collegial and impartial review of the record." And based on this evidence, and his reasonable interpretation of it, the ALJ specifically found that Hickey suffered from a preexisting condition that contributed to the Injury, and that therefore Hickey had to "meet the higher standard of legal causation." Under these circumstances, the ALJ's finding was supported by substantial evidence.

¶33    On remand, the Commission will need to examine the evidence and make its own finding, and if it makes a finding that diverges from the ALJ's, the parties will of course be free to seek judicial review of that finding. But if the Commission chooses, based on the same record submitted to us, to adopt the ALJ's finding in its entirety, we have here determined that such a finding, on the part of the Commission, would be supported by substantial evidence.

CONCLUSION

¶34    The Commission erred in determining that the Injury was legally caused by the requirements of Hickey's work for JBS, and we set aside its order on that basis. We remand this matter to the Commission for further proceedings, including consideration of the threshold question about whether Hickey even needs to show legal causation in the first place.

_____